11-5113-cv(L)
United States of America v. City of New York

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2011

Heard: June 26, 2012          Decided: May 14, 2013

Docket No. 11-5113-cv(L), 12-491-cv(XAP)

- - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

THE VULCAN SOCIETY, INC., MARCUS HAYWOOD, CANDIDO NUNEZ, ROGER GREGG,

    Intervenors-Plaintiffs-Appellees-Cross-Appellants

              v.

CITY OF NEW YORK, MICHAEL BLOOMBERG MAYOR, and NICHOLAS SCOPPETTA, NEW YORK FIRE COMMISSIONER, in their individual and official capacities,

    Defendants-Appellants-Cross-Appellees,

NEW YORK CITY DEPARTMENT OF CITYWIDE ADMINISTRATIVE SERVICE, NEW YORK CITY FIRE DEPARTMENT

    Defendants.[1]

- - - - - - - - - - - - - - - - - - - - - - - - - - -

Before: NEWMAN, WINTER, and POOLER, <u>Circuit Judges</u>.

    Appeal by the City of New York, Mayor Michael Bloomberg, and former Fire Commissioner Nicholas Scoppetta from the December 8, 2011, order of the United States District Court for the Eastern District of

---

[1] The Clerk is directed to amend the official caption to conform to the caption above.

New York (Nicholas G. Garaufis, District Judge), issuing an injunction against the City with respect to the hiring of entry-level firefighters, and a cross-appeal by the Intervenors from the February 1, 2012, partial final judgment dismissing federal and state law claims against Mayor Bloomberg and former Fire Commissioner Scoppetta. The City's appeal also seeks review of the January 13, 2010, order granting the Intervenors summary judgment on their disparate treatment claim, which alleged intentional discrimination, and, on the appeal from the injunction, seeks reassignment of the case to a different district judge.

Summary judgment on the disparate treatment claim against the City is vacated; dismissal of the federal claims against Mayor Bloomberg is affirmed; dismissal of the state law claims against Mayor Bloomberg and Commissioner Scoppetta is affirmed; dismissal of the federal law claims against Commissioner Scoppetta is vacated; the injunction is modified, and, as modified, is affirmed; and the bench trial on the liability phase of the discriminatory treatment claim against the City is reassigned to a different district judge.

Affirmed in part, vacated in part, and remanded. Judge Pooler dissents in part with a separate opinion.

Lisa J. Stark, United States Department of Justice, Washington, D.C. (Thomas E. Perez, Dennis J. Dimsey, Holly A. Thomas, United States Department of Justice, Washington, D.C., on the brief), for Appellee.

Richard A. Levy, Levy Ratner, P.C., New York, NY (Center for Constitutional Rights, New York, NY; Scott + Scott LLP, New York, NY, on the brief), for P l a i n t i f f s - A p p e l l e e s - C r o s s - Appellants.

Deborah A. Brenner, Asst. Corporation Counsel, New York, NY (Michael A. Cardozo, Corporation Counsel of the City of New York, Alan G. Krams, Asst. Corporation Counsel, New York, New York, N.Y., on the brief), for Appellants-Cross-Appellees.

(Keith M. Sullivan, Sullivan & Galleshaw, LLP, Queens, NY, for amicus curiae Merit Matters, Inc., in support of Appellants-Cross-Appellees.)

(Lawrence S. Lustberg, Alicia L. Bannon, Gibbons P.C., Newark, NJ, for amicus curiae International Association of Black Professional Firefighter and Black Chief Officers Committee, in support of Plaintiffs-Appellees-Cross-Appellants.)

(Rachel Godsil, Kathryn Pearson, Jon Romberg, Andrew Van Houter, Seton Hall University School of Law, Center for Social Justice, Newark, NJ, for amicus curiae American Values Institute, in support of Plaintiffs-Intervenors-Appellees.)

(ReNika C. Moore, Debo P. Adegbile, Elise C Boddie, Johnathan J. Smith, Ria A. Tabacco, NAACP Legal Defense and Educational Fund, Inc., New York, NY; Joshua Civin, Washington, D.C., for amicus curiae NAACP Legal Defense & Educational Fund, Inc., in support of Appellees.)

JON O. NEWMAN, Circuit Judge:

This case, brought by the United States pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., concerns allegations of racial discrimination in the hiring of New York City firefighters. The principal issues are whether summary judgment was properly entered against the City on a claim of intentional discrimination, whether claims against the City's Mayor and former Fire Commissioner were properly dismissed, whether an injunction, based both on the finding of intentional discrimination and an unchallenged finding of disparate impact arising from entry-level exams, is too broad, and whether, in the event of a remand, the case, or some portion of it, should be reassigned to another district judge. These issues arise on an appeal from the December 8, 2011, order and a cross-appeal from February 21, 2012, partial final judgment of the United States District Court for the Eastern District of New York (Nicholas G. Garaufis, District Judge) in a suit brought by the United States against the City of New York. The Vulcan Society, Inc. ("the Vulcans" or "the Intervenors"), an organization of black[2] firefighters, intervened, along with several named firefighters. The Intervenors' complaint added as defendants the Fire Department of the City of New York ("FDNY"), the New York City Department of Citywide Administrative Services ("DCAS"), and Mayor Michael Bloomberg and then-New York Fire

---

[2] We have adopted the form of racial identification (without capitalization) used by the Vulcans.

-4-

Commissioner Nicholas Scoppetta in their individual and official capacities.

The City appeals from the December 8, 2011, order issuing a far-reaching permanent injunction against the City. The City contends that this appeal brings up for review the January 13, 2010, order granting summary judgment against the City on the Intervenors' disparate treatment claim, which alleged intentional discrimination. The Intervenors cross-appeal from the February 1, 2012, partial final judgment, entered pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, dismissing the Intervenors' claims against Defendants Mayor Bloomberg and Fire Commissioner Scoppetta on grounds of Immunity.

We conclude that (1) summary judgment was improperly entered on the Intervenors' disparate treatment claim, (2) the federal and state law claims against Mayor Bloomberg were properly dismissed, as were the state law claims against Commissioner Scoppetta, but the federal law claims against Commissioner Scoppetta should be reinstated, (3) most portions of the injunction based on the unchallenged disparate impact finding were within the District Court's remedial discretion, but other portions, particularly those portions based on the improper discriminatory treatment ruling, exceeded that discretion, and (4) on remand, the bench trial on the liability phase of the disparate treatment claim against the City should be reassigned to a different district judge. We therefore, affirm in part, vacate in part, and remand.

Background

The extensive factual and procedural background of this litigation is set forth in detail in United States v. City of New York, 637 F. Supp. 2d 77 (E.D.N.Y. 2009) ("Disparate Impact Op.").

Discrimination history. New York City has a substantial black and Hispanic population. According to the Department of City Planning, in 2002, blacks were 25 percent and Hispanics were 27 percent of the population. At that time, the percentage of firefighters who were black was 2.6 and the percentage who were Hispanic was 3.7. The low percentage of minority personnel in the FDNY has persisted for some time. From 1963 to 1971 only 4 percent of all FDNY employees were black. When the pending litigation commenced in 2007, the percentages of black and Hispanic firefighters had increased to only 3.4 percent and 6.7 percent, respectively. The black firefighter percentage for New York City has been significantly below those for other cities with substantial black population. In 1999, for example, when the black firefighter percentage for New York City was 2.9 percent, the percentages were 14 percent in Los Angeles, 17.1 percent in Houston, 20.4 percent in Chicago, and 26.3 percent in Philadelphia. The City's black percentage of firefighters has also been significantly below the percentages for other uniformed services in New York City. As of 2000, the percentage of blacks in the FDNY was 3.8 percent; the percentages in the Police Department, the Sanitation Department, and the Corrections Department were 16.6, 24.3, and 61.4, respectively.

-6-

In 1973, the written examination for entry-level New York City firefighters was held to have a discriminatory impact on minority applicants. See Vulcan Society of New York City Fire Dep't, Inc. v. Civil Service Commission, 360 F. Supp. 1265, 1277 (S.D.N.Y.), aff'd in relevant part, 490 F.2d 387 (2d Cir. 1973). Entry-level exams used for firefighters in 1988 and 1992 has a disparate impact on blacks,[3] although use of these exams was not challenged in court.

Pending litigation - disparate impact claims. In August 2002, the Vulcans filed an unlawful discrimination complaint with the federal Equal Employment Opportunity Commission ("EEOC"). The EEOC subsequently referred the complaint to the Department of Justice. In May 2007, the United States ("the Government") sued the City under Title VII, challenging two separate FDNY employment procedures for screening and selecting entry-level firefighters alleged to have an unjustified disparate impact on black and Hispanic applicants. Specifically, the Government challenged the use of two written examinations, No. 7029, administered in 1998, and No. 2043, administered in 2002 (the "Exams"), that initially screened applicants on a pass/fail basis. The Government also challenged the rank-order processing of applicants, i.e., establishing a passing score to reflect FDNY needs for new recruits and listing, in order of test

_____

[3] The percentage of blacks who took the 1988 exam was 10.9; of the 5,000 highest scoring candidates, the black percentage was 2.2, and the percentage hired was 1.3. In 1992, the percentage of blacks taking the exam was 8.5; the percentage hired was less than 2.

-7-

scores, all applicants above that score. Candidates who passed the written FDNY Exams and a physical performance test were place on a rank-order eligibility list that was based, in part, on the written examination score.

The FDNY administered the Exams to more that 34,000 firefighter applicants and hired more than 5,300. Of the 3,100 blacks and 4,200 Hispanics who took the Exams, the FDNY hired 461 blacks and 184 Hispanics. For Exam No. 7029, the pass rate for whites was 89.9 percent and for blacks 60.3 percent. For Exam No. 2043, the pass rate for whites was 97.2 percent and or blacks 85.4 percent.

The Government's complaint alleged that the Exams were neither job-related nor consistent with business necessity, and sought to enjoin the challenged procedures and to require that the City take "appropriate action to correct the present effects of its discriminatory policies and practices."

On September 5, 2007, the District Court permitted the Vulcans and several named individuals to intervene.[4] The Intervenors' complaint added as defendants the DCAS, the FDNY, Mayor Bloomberg, and then-Fire Commissioner Scoppetta. After the District Court bifurcated the case

---

[4] The Intervenors had previously filed a complaint without leave of the District Court. That complaint contained a jury demand. In granting the Intervenors leave to file a complaint on September 5, 2007, the District Court noted that the Intervenors and the Defendant, i.e., the City, had waived their right to a jury trial. The Intervenors' permitted complaint, filed on September 25, 2007, does not contain a jury demand, and no defendant has made such a demand.

into separate liability and relief phases, the Government and the Intervenors moved for partial summary judgment on the disparate impact claim. Thereafter, the Court, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, certified a class consisting of black applicants for the position of entry level firefighters.[5]

On July 22, 2009, the District Court granted the Government's and the Intervenors' motion for summary judgment on the disparate impact claim. See Disparate Impact Op., 637 F. Supp. 2d at 132. The Court ruled that the Exams and the rank-ordering of results disproportionately impacted black and Hispanic applicants, and that the City had not satisfied its burden of demonstrating that the employment procedures were "job-related" or "consistent with business necessity." Id. at 84-132. The Court's finding of disparate impact

---

[5] The class consists of:

All black firefighters or firefighter applicants who sat for either Written Exam 7029 or Written Exam 2043 [and] were harmed by one or more of the following employment practices:

(1) Defendants' use of Written Exam 7029 as a pass/fail screening device with a cutoff score of 84.75;

(2) Defendants' rank-order processing of applicants who passed Written Exam 7029;

(3) Defendants' use of Written Exam 2043 as a pass/fail screening device with a cutoff score of 70.00; and

(4) Defendants' rank-order processing of applicants who passed Written Exam 2043.

United States v. City of New York, 258 F.R.D. 47, 67 (E.D.N.Y. 2009).

was based on undisputed statistical evidence showing that black and Hispanic applicants disproportionately failed the Exams and on a meticulous application of this Court's decision in Guardians Ass'n of the New York City Police Dep't. Inc. v. Civil Service Commission, 630 F.2d 79 (2d Cir. 1980) ("NYC Guardians"), outlining the standards for assessing the job-relatedness of an employment exam. See Disparate Impact Op., 637 F. Supp. 2d at 87-95. Thereafter, the City began using Exam 6019, which the District Court permitted to be used on an interim basis, despite its disparate impact. See United States v. City of New York, 681 F. Supp. 2d 274, 294-95, 300-02. The Court afforded the City an opportunity to have Exam 6019 validated, see id., 681 F. Supp. 2d at 300, and subsequently found, after a hearing in July 2010, that the exam was invalid, see United States v. City of New York, No. 07-cv-2067, 2010 WL 4137536, at *5 (E.D.N.Y. Oct. 19, 2010). On this appeal, the City does not challenge the grant of summary judgment against the City on the disparate impact claim, nor, as far as we can determine, the District Court's ruling on the invalidity of Exam 6019.

Pending litigation - disparate treatment claim. In addition to reasserting the disparate impact claim from the Government's complaint, the Intervenors' complaint added a discriminatory treatment claim, alleging that the Defendants' use of the challenged employment procedures constituted intentional discrimination against black applicants. That claim raises one of the central issues on this appeal.

-10-

On July 25, 2008, the District Court denied the Intervenors' motion to augment their discriminatory treatment claim by amending their complaint to challenge "additional discriminatory screening and selection devices" used from 1999 to the present. The Court noted that, at the time that the Intervenors had sought to intervene, they had represented that they were "taking pleadings as they find them," and were simply seeking to add the disparate treatment claim.

On Sept. 18, 2009, the City moved to dismiss the Intervenors' claim of intentional discrimination, and, on October 320, 2009, the Intervenors filed a motion for partial summary judgment on the issue of discriminatory intent. The Government, which had not alleged discriminatory treatment in its complaint, did not join the Intervenors' motion for summary judgment on the disparate treatment claim.

On January 13, 2010, the District Court issued a comprehensive opinion granting the Intervenors' motion for summary judgment on their disparate treatment claim. See United States v. City of New York, 683 F. Supp. 2d 225, 255 (E.D.N.Y. 2010) ("Disparate Treatment Op."). We recount the details of that ruling in Part II, infra. In that opinion, the Court dismissed the Intervenors' Title VII claims against Mayor Bloomberg and Commissioner Scoppetta because individuals are not subject to liability under Title VII, id. at 243-44, and dismissed the discriminatory treatment claim against them on the ground that they were entitled to qualified and official immunity, id. at 269-72.

-11-

Pending litigation - relief. On September 10, 2009, after the Court's July 22, 2009, Disparate Impact Opinion but before its January 13, 2010, Disparate Treatment Opinion, the Government submitted a proposed order requesting injunctive and monetary relief to implement the Disparate Impact Opinion.  On January 21, 2010, eight days after the Disparate Treatment Opinion, the Court issued the first of four orders dealing with relief.  The January 21 order primarily alerted the parties to monetary and compliance issues that the Court anticipated pursuing, but specifically required the City to develop a new testing procedure for entry-level firefighters.  It left for future consideration the extent to which the City could continue to use Exam 6019, a test the City first administered in January 2007 and had used thereafter to generate its most recent firefighter eligibility list.  The validity of that test had not previously been challenged or adjudicated.

On May 26, 2010, the Court issued a second relief order.  In that order, the Court stated that, in the absence of needed materials, it could not then determine the validity of Exam 6019 nor determine to what extent the FDNY could use the results of that exam for entry-level hiring of firefighter.  In view of the complexity of pending relief issues, the Court appointed a Special Master to facilitate the

-12-

Court's assessment of Exam 6109 and to oversee the City's development of a new exam.[6]

On October 19, 2010, the Court issued a third relief order. That order permanently enjoined the City from using Exam 6019, with a limited exception not relevant to the appeal.

On December 9, 2010, the Intervenors moved for equitable and monetary relief based on the Court's previous finding, on motion for summary judgment, of disparate treatment. Among other injunctive relief, they requested the appointment of monitor to oversee compliance, enhanced recruitment and advertising to target minority applicants, modification of the FDNY's post-exam screening process, and prevention of retaliation and workplace discrimination against black firefighters. On February 28, 2011, the Government submitted a revised proposed relief order, requesting relief based on the Court's disparate impact finding. In August 2011, the District Court held a bench trial to determine appropriate injunctive relief for the City's intentional discrimination. The Government did not participate in that trial.

On September 30, 2011, the Court issued detailed findings of fact, based on the evidence introduced at th bench trial, to support its

_____

[6] The Court initially appointed Robert M. Morgenthau as Special Master. On June 1, 2010, after the City objected to the selection of Morgenthau because of the City's disputes with the New York County District Attorney's Office, which he had headed, Morgenthau asked to be relieved, and on the same day the Court appointed Mary Jo White.

subsequent grant of injunctive relief. The Court noted that its "assessment of the evidence" was "influenced" by the factual record established in earlier stages of the litigation, including the finding that Exams 7029 and 2043 had a disparate impact on black and Hispanic firefighter candidates, the finding of intentional discrimination, and the finding that Exam 6019 was invalid for lack of job validation. United States v. City of New York, No. 07-CV-2067, 2011 WL 766158, at *1 n.1 (E.D.N.Y. Sept. 30, 2011). Approximately one week later, the Court issued a draft remedial order and informed the parties that it intended to appoint a Court Monitor to oversee the City's compliance with this order. The Court permitted the City and its Intervenors an opportunity to comment on the draft order. On December 8, 2011, the Court issued the injunction that is a principal subject of this appeal. See United States v. City of New York, No. 07-CV-2067, 2011 WL 6131136 (E.D.N.Y. Dec. 8, 2011) ("Injunction Op."). The details of the terms of that injunction will be recounted in Part IV, infra, dealing with the City's objections to several of those terms.

On February 1, 2012, the District Court, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, certified for entry of partial summary judgment its ruling dismissing the claims against Mayor Bloomberg and Commissioner Scoppetta on grounds of qualified and official immunity.

The City filed a timely appeal, and the Intervenors filed a timely cross-appeal, which have been consolidated. Motions for back-pay and

-14-

damages remain pending in the District Court and are not the subject of this appeal.

Discussion

Before considering any of the issues on appeal, we note that the City has explicitly declined to challenge the District Court's disparate impact ruling, the remedy requiring development of a new entry-level exam, or the appointment of a Special Master. The City's appellate papers also present no challenge to the District Court's third relief order substantially enjoining use of Exam 6019. What the City challenges on its appeal is the granting of summary judgment in favor of the Intervenors on their disparate treatment claim and all aspects of the injunction beyond those requiring development of a new entry-level exam. On the cross-appeal, the Intervenors challenge the District Court's dismissal of their claims against Mayor Bloomberg and Commissioner Scoppetta on the ground of qualified immunity.

I. Appellate Jurisdiction

All parties acknowledge our jurisdiction to review the December 8, 2011, injunction, see 28 U.S.C. § 1292(a)(1), and the February 1, 2012, partial final judgment dismissing the claims against Mayor Bloomberg and Commissioner Scoppetta, see Fed. R. Civ. P. 54(b). The Intervenors challenge our jurisdiction to review the District Court's January 13, 2012, ruling granting the Intervenors summary judgment on their disparate treatment claim. They point out that this ruling is not a final order and has not been incorporated into a final judgment.

The City responds that we have jurisdiction over the disparate treatment ruling because it is "inextricably intertwined," with the injunction. <u>Lamar Advertising of Penn, LLC v. Town of Orchard Park</u>, 356 F.3d, 371 (2d Cir. 2004) (internal quotation marks omitted); <u>see also</u> <u>Swint v. Chambers County Commission</u>, 514 U.S. 35, 51 (1995).

We agree with the City. First, the Intervenors themselves focused almost exclusively on the disparate treatment finding in their proposed order for injunctive relief, and, in summation during the bench trial on relief, emphasized that broad remedies were needed to counteract intentional discrimination. More significantly, the District Court explicitly acknowledged that its findings on which the injunction would later be based were "influenced" by its disparate treatment finding, and some of the more far-reaching provisions of that injunction appear to be grounded, at least partially if not entirely, on that finding. Sufficient "intertwining" exists between the injunction and the disparate treatment summary judgment ruling to support pendent appellate jurisdiction over the latter ruling.

II. The Summary Judgment Ruling on the Intervenors' Disparate Treatment Claim

In considering the District Court's grant of summary judgment to the Intervenors on their disparate treatment claim, which requires an intent to discriminate, we note at the outset that questions of subjective intent can rarely be decided by summary judgment. <u>See</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 816 (1982). The principal issue

-16-

presented by the summary judgment ruling concerns the nature of a defendant's obligation to respond to a prima facie case presented by a plaintiff class in a pattern-or-practice discriminatory treatment lawsuit.

Initiation of a pattern-or-practice claim. Before considering that issue, we first consider how a pattern-or-practice claim arises. A pattern-or-practice claim under Title VII can be asserted either by the United States or by a class of plaintiffs, usually current or prospective employees against whom some adverse employment action has been taken because of an impermissible reason such as race. Section 707(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-6(a), authorizes the Attorney General to bring a civil action whenever that officer "has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by [subchapter VI of chapter 21], and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described . . . ."[7] A group of plaintiffs, entitled to be certified as a class, may also initiate a pattern-or-practice suit. See Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867, 876 n.9 (1984) ("[T]he elements of a prima facie pattern-or-practice case are the same [as a

---

[7] Section 707 was amended by Section 5 of the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-6(c), to give the EEOC, rather than the Attorney General, authority to bring patter-or-practice suits against private sector employers.

-17-

Government-initiated suit under Section 707(a)] in a private class action."); Franks v. Bowman Transportation Co., 424 U.S., 747, 750-51 (1976) (analyzing class action alleging pattern of discriminatory employment practices).

Although the pending suit was brought by the United States, the Government did not allege a pattern or practice of discriminatory treatment. Its claim was solely that the City's use of Exams 7029 and 2043 had a discriminatory impact on minority applicants for the position of entry-level firefighter. The Intervenors, once certified as a class, have asserted what amounts to claim of pattern-or-practice discriminatory treatment.[8]

_____

[8] The Intervenors' complaint did not explicitly assert a claim of a pattern-or-practice. That phrase first entered this litigation rather unobtrusively as one aspect of the prayer for relief in the Intervenors' complaint, which, in listing the elements of a requested injunction, asked the Court to "appoint entry-level firefighters from among qualified black applicants in sufficient numbers to offset the historic pattern and practice of discrimination against blacks in testing and appointment to that position." Intervenors' Complaint, Prayer for Relief ¶ 3(d). The phrase is not mentioned at all in the Intervenors' extensive memorandum of law in support of their motion for summary judgment on the disparate treatment claim. Nevertheless, by the time the District Court issued its Disparate Treatment Opinion, the phrase had become prominent. Section IV of that opinion is captioned "INTERVENORS' TITLE VII PATTERN-OR-PRACTICE DISPARATE TREATMENT CLAIM." 683 F. Supp. 2d at 246. And as the litigation has reached this Court, the phrase appears repeatedly in the briefs of the City and the Intervenors, although it is conspicuously absent from the Government's brief (except for one mention in the description of the District Court's Disparate Treatment Opinion, see Brief for United States at 19).

We surmise that the Intervenors are entitled to assert a pattern-or-practice claim because they sought and were granted class action status and alleged not only the disparate impact of Exams 7029 and

-18-

    Comparison of individual and pattern-or-practice claims.  We next compare individual and pattern-or-practice claims.  The principal difference between individual and pattern-or-practice discriminatory treatment claims is that, although both require an intent to discriminate, an individual claim requires an intent to discriminate against one person, see, e.g., McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and a pattern-or-practice claim requires that "racial discrimination was the company's standard operating procedure[,] the regular rather than the unusual practice," International Brotherhood of Teamsters v. United States, 431 U.S., 324, 336 (1977), and that the discrimination was directed at a class of victims, see, e.g., Franks, 424 U.S. at 772.[9]  It should be noted that "[a] pattern or practice case is not a separate and free-standing cause of action . . ., but is really merely another method by which disparate treatment can be shown." Chin v. The Port Authority of New York and New Jersey, 685

---

2043 but also a long-standing pattern of discrimination in hiring firefighters.  Their complaint alleged, among other things, that "[t]he FDNY has a long history of unlawfully discriminating against blacks in its hiring process and of maintaining the number of black firefighters at its disproportionately low level compared to their representation in the population of the City as a whole," ¶ 31, "the FDNY has consistently failed and refused to comply with many of the [City's Equal Employment Practices Commission's] recommendations, particularly with regard to its hiring criteria," ¶ 32, and "the City and the FDNY have repeatedly failed and refused to remedy this obviously discriminatory situation," ¶ 33.

    [9] Cf. EEOC v. Shell Oil Co., 466 U.S. 54, 73 (1984) (requiring an EEOC charge filed by a commissioner to "identify the groups of persons that he has reason to believe have been discriminated against").

-19-

F.3d 135, 148-49 (2d Cir. 2012) (quoting in a parenthetical <u>Celestine v. Petroleos de Venezuela SA</u>, 266 F.3d 343, 355 (5th Cir. 2001)) (internal quotation marks omitted).[10]

Both types of suits involve a scheme of shifting burdens borne by the contending sides. In both, the plaintiff bears the initial burden of presenting a prima facie case. Both <u>McDonnell Douglas</u>, 411 U.S. at 807, and <u>Teamsters</u>, 431 U.S. at 336, refer to the plaintiff's initial burden as a burden to establish "a prima facie case," meaning sufficient evidence to create a rebuttable presumption of the existence of the ultimate fact at issue: in <u>McDonnell Douglas</u>, the employer's intent to discriminate against the plaintiff, and in <u>Teamsters</u>, the employer's pervasive practice of intentional discrimination against the class. The Supreme Court has noted that in general "[t]he phrase 'prima facie case' not only may denote the establishment of a legally mandatory, rebuttable presumption, but also may be used by courts to describe the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue," <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 254 n.7 (1981), and has explicitly instructed "that in the Title VII context we use 'prima facie case' in the former sense," <u>id</u>.

---

[10] The Supreme Court has criticized the EEOC for not adopting "special regulations more closely tailored to the characteristics of 'pattern-or-practice' cases." <u>Shell Oil Co.</u>, 466 U.S. at 67 n. 19.

-20-

In an individual case, the plaintiff's initial burden consists of the now familiar components of showing "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." McDonnell Douglas, 411 U.S. at 802. This burden is "not onerous," Burdine, 450 U.S. at 253; indeed, it is "minimal," St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993), or "slight," Wanamaker v. Columbian Rope Co., 108 F. 3d 462, 465 (2d Cir. 1997).

In a pattern-or-practice case, the plaintiff's initial burden is heavier in one respect and lighter in another respect than the burden in an individual case. It is heavier in that the plaintiff must make a prima facie showing of a pervasive policy of intentional discrimination, see Teamsters, 431 U.S. at 336, rather than a single instance of discriminatory treatment. It is lighter in that the plaintiff need not initially show discrimination against any particular present or prospective employee. See id. at 360; Chin, 685 F.3d at 147. Although instances of discrimination against particular employees are relevant to show a policy of intentional discrimination, they are not required; a statistical showing of disparate impact might suffice. See Hazelwood School District v. United States, 433 U.S. 299, 307-08 (1977) ("Where gross statistical disparities can be shown, they

-21-

alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination."). With both types of cases, the plaintiff's initial burden is only to present a prima facie case that will support a rebuttable presumption of the ultimate fact in issue.

Once the McDonnell Douglas plaintiff has established its prima facie case, the burden then shifts to the employer "to rebut the presumption of discrimination," Burdine, 450 U.S. at 254. The employer need only "'articulate come legitimate, nondiscriminatory reason for the employee's rejection.'" Id. at 253 (emphasis added) (quoting McDonnell Douglas, 411 U.S. at 802).[11] In Teamsters, the Supreme Court said that the employer responding to a prima facie case in a pattern-or-practice suit has the burden to "defeat" that case, 431 U.S. at 360. "[D]efeat" might be thought to imply something stronger that "rebut," but the Court's language indicates that the Court means the same thing in both contexts. In McDonnell Douglas, the court said that the employer may discharge its rebuttal burden by "articulat[ing] some legitimate, nondiscriminatory reason for the employee's rejection." 411 U.S. at 802, and in Teamsters, the Court similarly said that the employer may do so by "provid[ing] a

---

[11] In this respect, the rebuttal burden on the employer in a discriminatory treatment case is less than the burden in a disparate impact case. In the latter case, the employer bears the burden of proving that the neutral employment policy, such as an exam, shown to have a discriminatory impact, is job-related. See Albemarle Paper Co. v. Moody, 422 U.S. 405, 424 (1975); Griggs v. Duke Power Co., 401 U.S. 424, 431-32 (1971).

nondiscriminatory explanation for the apparently discriminatory result," 431 U.S. at 360 n. 46. Although the Court has explicitly called the employer's burden in a McDonnell Douglas case a burden of "production," Burdine, 450 U.S. at 255, and has not used that word to describe the employer's burden in a pattern-or-practice case, we think the rebuttal burden in both contexts is one of "production." See Reynolds v. Barrett, 685 F.3d 193, 203 (2d Cir. 2012) (noting that in pattern-or-practice case "the burden of production shifts to the employer"); Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 159 (2d Cir. 2001) (noting that in pattern-or-practice case "'the burden [of production] then shifts to the employer'") (quoting Teamsters, 431 U.S. at 360) (brackets in Robinson), abrogated on other grounds by Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2641 (2011).[12]

A central issue in the pending case is what showing an employer must make to satisfy its burden of production in a pattern-or-practice case. In Teamsters the Supreme Court stated that the employer's burden was "to defeat the prima facie showing of a pattern or practice by demonstrating that the Government's proof is either inaccurate or insignificant." 431 U.S. at 360 (emphasis added). The emphasized words raise a question as to whether the Supreme Court thought the employer's rebuttal evidence must be directed at the statistics that

_____

[12] In Teamsters, the Supreme Court had no need to label the nature of the employer's rebuttal burden because the Court was reviewing a case that had been fully tried on the merits.

-23-

often constitute the prima facie case of discrimination or simply at the rebuttable presumption of discrimination that arises from those statistics.

We think the Court meant that the employer must produce any evidence that is relevant to rebutting the inference of discrimination. No plaintiff can limit the type of evidence that a defendant must produce to rebut a prima facie case by its selection of particular evidence to support that case. The Supreme Court explicitly recognized this obvious point in Teamsters when it stated that, although "[t]he employer's defense must, of course, be designed to meet the prima facie case . . . [,] [w]e do not mean to suggest that there are any particular limits on the type of evidence an employer may use." 431 U.S. at 360 n.46. The Court offered an example of an employer whose pattern of post-Act hiring was a product pre-Act hiring, id. at 360, an example of evidence that would rebut the inference of discriminatory intent arising from the plaintiff's statistics, but not dispute the statistics themselves. That showing would not demonstrate that the proof of the pattern was inaccurate or insignificant; it would demonstrate that the proof of the pattern was legally irrelevant.

Of course, it is always open to a defendant to meet its burden of production by presenting a direct attack on the statistics relied upon to constitute a prima facie case. A defendant might endeavor to show that the plaintiff's statistics are inaccurate, for example, infected

-24-

with arithmetic errors, or lacking in statistical significance, for example, based on too small a sample. But the rebuttal need not be so limited. A defendant may rebut the inference of a discriminatory intent by accepting a plaintiff's statistics and producing non-statistical evidence to show that it lacked such an intent. In Teamsters, the Supreme Court recognized this means of rebutting a prima facie case by stating that "the employer's burden is to provide a nondiscriminatory explanation for the apparently discriminatory result." 431 U.S. at 360 n.46. Again, such an explanation rebuts the inference from a plaintiff's statistics, even though it does not directly challenge the statistics themselves.[13]

---

[13] Our dissenting colleague contends that we have "conflate[d] two distinct tests set out in our disparate treatment jurisprudence," [slip op. __ (dissent at 1)] and that where a plaintiff presents statistics to establish its prima facie case of a pattern or practice or pervasive discrimination, "those statistics must necessarily be addressed" by the defendant's rebuttal evidence, [slip op. __ (dissent at 5)].

As to the first contention, we have explicitly recognized the crucial difference that a plaintiff endeavoring to present a pattern or practice claim of intentional discrimination must prove a pervasive pattern of such discrimination whereas a plaintiff endeavoring to present only a claim of individual discrimination may succeed by showing that a facially neutral policy had a discriminatory impact.

As to the second contention, our dissenting colleague cites Teamsters, 431 U.S. at 360, as stating that an employer rebutting a prima facie pattern or practice case must demonstrate that "the plaintiff's statistics were inaccurate or insignificant." [slip op. __ (dissent at 3)]. But the referenced sentence from Teamsters refers to the plaintiff's "proof," not the plaintiff's "statistics." A defendant, by presenting evidence of its choosing that it lacked a discriminatory intent, satisfies its rebuttal burden of showing that the plaintiff's prima facie proof lacked significance. Furthermore,

Some confusion might have been created on this point by a passage in the late Professor Arthur Larson's treatise on employment discrimination that this Court quoted in <u>Robinson</u>, 267 F.3d at 159. That passage begins by stating, "Three basic avenues of attack are open to the defendant challenging <u>the plaintiff's statistics</u>, namely assault on the source, accuracy, or probative force." 1 Arthur Larson <u>et al.</u>, <u>Employment Discrimination</u> § 9.03[2], at 9-23 (2d ed. 2001) (emphasis added). This sentence, read in isolation, might be thought to require an employer to challenge the plaintiff's statistics as such. But that interpretation is dispelled by Prof. Larson's later recognition in the same passage, also quoted in <u>Robinson</u>, 267 F.3d at 159, that a defendant may use "other <u>non-statistical evidence</u> tending to rebut the inference of discrimination." Larson, <u>supra</u>, § 9.03[2], at 9-24 (emphasis added). Indeed, the current version of <u>Employment Discrimination</u>, compiled by Prof. Larson's son, has rewritten the sentence quoted in <u>Robinson</u> and, more significantly, includes a subsection making it clear that non-statistical evidence, including an employer's affirmative action efforts, are "both relevant to and

---

although the dissent suggests that we have ignored <u>Teamsters</u> by permitting a defendant to rebut a prima facie case without directly challenging the plaintiff's statistics, it is the <u>Teamsters</u> opinion itself that says, "We do not mean to suggest that there are any particular limits on the type of evidence an employer may use" to meet a plaintiff's prima facie case, 431 U.S. at 360 n.46, and also says that the employer's burden in rebutting a prima facie case "is to provide a nondiscriminatory explanation for the apparently discriminatory result," <u>id.</u>

probative of absence of intent to discriminate." 1 Lex Larson, Employment Discrimination § 9.03[2][c], at 9-20.1 (2d ed. 2011) (footnote omitted).

We have recognized that non-statistical evidence, such as a defendant's affirmative action program, is probative of the absence of an employer's intent to discriminate. See Coser v. Moore, 739 F.2d 746, 751-52, (2d Cir. 1984); see also EEOC v. Sears, Roebuck & Co., 839 F.2d 302, 314 (7th Cir. 1988) ("[S]tatistical evidence is only one method of rebutting a statistical case."). Although cases such as Coser and Sears, Roebuck were considering evidence available to negate discriminatory intent at trial, we see no reason why a defendant may not proffer such evidence to satisfy its burden of production in advance of trial on the merits.[14]

---

[14] Our recent opinion in Reynolds v. Barrett stated that the defendant's burden of production is to show "that the statistical evidence proffered by the plaintiffs is insignificant or inaccurate." 685 F.3d at 203 (citing Teamsters, 341 U.S. at 360 (substituting "statistical evidence" for proof," the word used in the relevant passage in Teamsters)). This statement in Reynolds is dictum; the issue in that case was not the required content of a defendant's rebuttal, but "whether recourse to the pattern-or-practice evidentiary framework is appropriate in a suit against individual state officials brought pursuant to 42 U.S.C. § 1983 for intentional discrimination." 685 F,3d at 197. Even as dictum, we think this sentence in Reynolds should be understood to offer one way to rebut a prima facie case, but surely not the only way. That broader understanding is required by the recognition in Teamsters that (a) an employer may rebut a prima facie case by offering a nondiscriminatory explanation, 431 U.S. at 360 n.46, and (b) the Supreme Court did not intend to limit the type of evidence an employer may use, id. It is also required by the incontestable point that no plaintiff can limit its adversary's responding evidence by the type of evidence that the plaintiff chooses to present.

Teamsters sets a high bar for the prima facie case the Government or a class must present in a pattern-or-practice case: evidence supporting a rebuttable presumption that an employer acted with the deliberate purpose and intent of discrimination against an entire class. 431 U.S. at 358. An employer facing that serious accusation must have a broad opportunity to present in rebuttal any relevant evidence that shows that it lacked such an intent.

Continuing with a comparison of the shifting burdens in individual and pattern-or-practice cases, we note that a defendant's burden of production "can involve no credibility assessment," Hicks, 509 U.S. at 509, and "necessarily precedes the credibility-assessment stage," id. (emphasis in original). Nothing in Teamsters suggests that these aspects of the defendant's production burden do not apply to pattern-or practice claims. Nor are there differences with respect to the remaining aspects of the burden-shifting scheme, at least at the liability stage of a trial. If the defendant fails to rebut the plaintiff's prima facie case, the presumption arising from an unrebutted prima facie case entitles the plaintiff to prevail on the issue of liability and proceed directly to the issue of appropriate relief. See Hicks, 509 U.S. at 509. On the other hand, if the defendant satisfies its burden of production, the presumption arising from the plaintiff's prima facie case "drops out," see id., 509 U.S. at 510-11, and the trier of fact must then determine, after a full trial, whether the plaintiff has sustained its burden of proving by a

preponderance of the evidence the ultimate fact at issue. See United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 715 (1983) (individual plaintiff must prove intent to discriminate); Teamsters, 431 U.S. at 336 (Government in pattern-or-practice case must prove that intentional discrimination was the defendant's standard operating procedure."). Of course, the evidence that originally supported the plaintiff's prima facie case remains available to contribute to the persuasive force of the plaintiff's proof on the ultimate issue. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000); Burdine, 450 U.S. at 256 n.10.

At the relief stage, however, a special rule applies in pattern-or-practice cases. Once the Government or a class has proven by a preponderance of the evidence a policy of intentional discrimination and seeks relief for individual victims of that policy, "[t]he proof of the pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy. . . . [T]he burden then rests on the employers to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons." Teamsters, 431 U.S. at 362 (citing Franks, 424 U.S. at 773 n.32). In Wal-Mart Stores, 131 S. Ct. at 2552 n.7, the inference was explicitly

called "a rebuttable inference."[15]

The Intervenors' prima facie case.  The statistical disparities supporting the unchallenged finding that the Exams has a racially disparate impact also served to establish a prima facie case on the Intervenors' claim of a pervasive pattern of discriminatory treatment, especially in light of the long-standing pattern of low minority participation in the FDNY. See Hazelwood School District, 433 U.S. at 307-08 ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination.").  The City does not dispute that the Intervenors presented a prima facie case of discriminatory treatment.

The City's rebuttal.  The City produced evidence attempting to rebut the inference that it had acted with a discriminatory intent. It articulated a nondiscriminatory reason for using the challenged exams - the fact that they were facially neutral.  The City also relied on its contention that the exams had been prepared in an attempt to comply with "acceptable test development methods." Defendants' Statement of Disputed Material Facts ¶ 1.  In support of this contention, the City proffered detailed declarations of Matthew Morrongiello, a Tests and Measurement Specialist in the City's DCAS

---

[15] This rebuttable inference arising at the relief stage, after proof by preponderance of the evidence at the liability stage of the existence of a pattern or practice of intentional discrimination, should not be confused with the rebuttable presumption arising at the threshold of the liability stage, after presentation of only a prima facie case of such a pattern or practice.

-30-

who analyzed Exam 7029, and Alberto Johnson, a DCAS employee who was primarily responsible for preparing Exam 2043. See Disparate Impact Op., 637 F. Supp. 2d at 100. Their affidavits detailed the efforts that they made to develop job-related exams.[16] The City also pointed to its efforts to increase minority hiring through targeted recruitment.

The District Court's rejection of the City's rebuttal. The District Court's grant of summary judgment to the Intervenors on their pattern-or-practice discriminatory treatment claim might be thought to mean either of two things. On the one hand, the Court might have concluded that the City had failed to satisfy its burden of production. On the other hand, the Court might have concluded that, on the available record, no reasonable fact-finder at trial could fail to find that the City maintained a pervasive policy of intentional discriminatory treatment. The Intervenors argued their motion on the latter theory. One section of their memorandum of law in support of their motion is captioned "THERE IS NO GENUINE ISSUE OF FACT AS TO THE CITY OF NEW YORK'S DISPARATE TREATMENT OF PLAINTIFFS-INTERVENORS UNDER TITLE VII, AND PLAINTIFFS-INTERVENORS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW." Memorandum of Law in Support of Motion for Summary Judgment and in Opposition to Individual Defendants' Motion for

---

[16] The District Court's ruling against the City on the Government's disparate impact claim discussed these efforts at length. See Disparate Impact Op., 637 F. Supp. 2d at 100-08.

Qualified Immunity at 8. That memorandum does not contend that the City failed only to satisfy its burden of production.

We think it is clear that the District Court granted summary judgment for the Intervenors because it is believed the City had not satisfied its burden of production. The Court stated, "If the employer fails to respond to plaintiffs' prima facie case, or if it fails to carry its burden to dispel the prima facie case, then the court '<u>must</u> find the existence of the presumed fact of unlawful discrimination and <u>must</u>, therefore, render a verdict for the plaintiff.'" <u>Disparate Treatment Op.</u>, 683 F. Supp. 2d 252 (quoting <u>Hicks</u>, 509 U.S. at 509-10 n.3 (emphases in <u>Hicks</u>)). The Court then added:

> What is important to note is that in either case, although the ultimate question as to the employer's state of mind is technically left unresolved - since the fact-finder has not found by a preponderance of the evidence that the employer acted with discriminatory purpose - the employer's failure to discharge the obligation imposed on it by the burden-shifting framework mandates a finding of unlawful discrimination.

<u>Id.</u> (Citing <u>Hicks</u>, 509 U.S. at 506).

The District Court deemed the City's rebuttal deficient for four somewhat related reasons. First, the Court thought that the City's burden of production required it specifically to challenge the Intervenors' statistics and faulted the City because it did "not attempt to meet or undermine the Intervenors' statistical evidence." <u>Disparate Treatment Op.</u>, 683 F. Supp. 2d at 253. "This failure alone," the Court stated, was a sufficient reason to grant summary

-32-

judgment to the Intervenors. See id. As we have explained above, this was too narrow a view of how a defendant may rebut a prima facie case. On the Intervenors' motion for summary judgment, the issue for the District Court was not whether the City had produced evidence sufficiently attacking the Intervenors' statistics. Instead, the issue was whether the City's rebuttal was sufficient to satisfy its burden of producing evidence to challenge the inference of intentional discrimination arising from the Intervenors' prima facie case.

Second, the District Court rejected the evidence the City produced to satisfy its burden of production as "either incredible or inapposite." Disparate Treatment Op., 683 F. Supp. 2d at 266. The Court's assessment of credibility (an assessment of information supplied in affidavits) was inappropriate. Determining whether a defendant has satisfied its burden of production "can involve no credibility assessment." Hicks, 509 U.S. at 509. Furthermore, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." Burdine, 450 U.S. at 254.

Nor was the City's rebuttal evidence "inapposite." All of it was properly presented in an attempt to show that the City lacked a discriminatory intent. Although the Exams produced a racially disparate impact and were determined by the District Court not to be sufficiently job-related to justify their use, see Disparate Impact Op., 637 F. Supp. 2d at 110-32, the City was entitled to produce whatever evidence it had to rebut the prima facie case of

-33-

discriminatory treatment.  That evidence properly included a showing that the Exams were facially neutral, see Raytheon Co. V. Hernandez, 540 U.S. 44, 51-52 (2003) (Under "the disparate-treatment framework . . . a neutral . . . policy is, by definition, a legitimate nondiscriminatory reason."), the efforts (albeit unsuccessful) to prepare job-related exams,[17] see NYC Guardians, 630 F. 2d at 112 (noting employer's "extensive efforts to . . . develop a test they hoped would have the requisite validity").[18] and the efforts at minority recruitment, see Washington v. Davis, 426 U.S. 229, 246

_____

[17] The District Court expressed the view that "the subjective motives of the people who designed the Exams are only circumstantially relevant to the question of whether the City's decision to use the Exams as screening and ranking devices was discriminatory." Disparate Treatment Op., 683 F. Supp. 2d at 254 (emphases in original).  But the City was entitled to produce evidence with that circumstantial relevance to rebut the claim that it used the Exams with discriminatory intent.

    The Intervenors contend that the City's rebuttal evidence concerning the preparation of the challenged exams is irrelevant because the test-makers' affidavits do not explain what the Intervenors assert is the "adverse action - here, the continued use of the challenged exams." Brief for Intervenors at 128 (internal quotation marks omitted).  However, the adverse action, for which the employer must supply a nondiscriminatory reason, is the failure to hire minority firefighters; the use of the Exams is a circumstance that the Intervenors contend shows that the city acted with discriminatory intent.  That contention will be available at trial.

[18] It defies understanding why the City would think it a virtue that "[t]he individuals who were principally responsible for developing Examinations 7029 and 2043, did not, prior to developing the Examinations[,] consult with counsel or review the [NYC] Guardians decision," Defendants' Statement of Disputed Material Facts ¶ 2.  The District Court characterized NYC Guardians as the "governing case in this Circuit for assessing the validity of employment tests." Disparate Impact Op., 637 F. Supp. 2d at 108.

-34-

(1976) ("[A]ffirmative efforts [of municipal employer] to recruit black officers . . . negated any inference that [employer] discriminated . . . .").

The District Court also appeared to consider the City's evidence inapposite because, in the Court's opinion, the City was not entitled to "construct a competing account of its behavior." Disparate Treatment Op., 683 F. Supp. 2d at 253. This view of the City's rebuttal burden runs directly counter to the Supreme Court's statement in Teamsters that "the employer's burden is to provide a nondiscriminatory explanation for the apparently discriminatory result." 431 U.S. at 360 n.46.

Third, the District Court viewed the City's opposition to the Intervenor's summary judgment motion as an improper effort to dispute the issue of discriminatory intent that the Court said would arise "at the end of any Title VII disparate-treatment inquiry." Disparate Treatment Op., 683 F. Supp. 2d at 252 (emphasis in original). This was improper, the Court thought, because "if defendants were allowed to sustain or circumvent their burden of production by invoking the ultimate issue of intent, the burden-shifting structure would become a nullity." Id. at 253.

We disagree. A defendant seeking to "defeat," Teamsters, 431 U.S. at 360, a prima facie case of intentional discrimination at the rebuttal stage has every right to produce evidence to show that it did not have such an intent. Although a conclusory denial will not

-35-

suffice, evidence that tends to support a denial is always permissible. When the Supreme Court said in Teamsters that the employer may satisfy its burden of production by "provid[ing] a nondiscriminatory explanation for the apparently discriminatory result," 431 U.S. at 324 n.46, it was offering an example of evidence that ws not disqualified as a rebuttal just because such evidence was also relevant to the ultimate issue of discriminatory intent.[19]

Producing at the rebuttal stage some evidence bearing on the ultimate issue of discriminatory intent does not render the burden-shifting structure a nullity. That structure serves the useful purpose of obliging the employer to identify a nondiscriminatory reason for its challenged action. If the employer fails to do so or otherwise fails to produce evidence that meets the inference arising from the plaintiff's prima facie case, the employer loses. See Hicks, 509 U.S. at 509. On the other hand, producing evidence that meets the prima facie case moves a pattern-or-practice claim on to trial on the merits, at which time the plaintiff has to prove by a preponderance of evidence that the real reason for the challenged action was an intent to discriminate. The burden-shifting scheme has not been impaired just because the employer's rebuttal not only meets the prima facie case but is also relevant to the ultimate issue at trial. Nothing in

---

[19] The District Court seems to have recognized this point by stating that the presumption arising from the prima facie case "obligates the employer to come forward with an explanation or contrary proof." Disparate Treatment Op., 683 F. Supp. 2d at 252.

Teamsters obliges an employer to withhold its evidence negating a discriminatory intent until that trial occurs.

Fourth, the District Court faulted the City for "attempt[ing] to circumvent its burden of production entirely by arguing that the Intervenors have not proved that the City harbored a subjective intent to discriminate against black applicants." Disparate Treatment Op., 683 F. Supp. 2d at 251. The Court understood the City to be faulting the Intervenors for "failure to produce direct evidence of the relevant decisionmakers' culpable mental state." Id. (emphasis added). That was not what the City said. In its memorandum opposing the Intervenors' motion for summary judgment on the discriminatory treatment claim, the City stated, "Plaintiffs-Intervenors have not, either directly or by inference, provided facts which would prove an intent to discriminate." Defendants' Memorandum of Law in Opposition to Plaintiffs-Intervenors' Motion for Summary Judgment at 2 (emphasis added). Correctly understanding that a prima facie case requires facts giving rise to an inference of intentional discriminatory treatment, the City was entitled to contend in rebuttal that the Intervenors had failed to present such facts, even though the District Court had found that their prima facie case was sufficient.

At trial on the ultimate issue of whether there was a policy of discriminatory intent, the fact-finder will consider, among other things, whether, as the Intervenors contend, the lack of job-relatedness of the Exams should have been apparent to the City and

whether the City's use of the Exams, once their racially disparate impact was known, proves, in light of the history of low minority hiring, that the City used the Exams with the intent to discriminate. Prior to that trial, the City provided a sufficient rebuttal to the Intervenors' prima facie case, and the granting of the Intervenors' motion for summary judgment was error.

III. Dismissal of Claims Against Mayor Bloomberg and Commissioner Scoppetta

The District Court dismissed the Intervenors' Title VII claim against Mayor Bloomberg and former Commissioner Scoppetta for failure to state a claim on which relief could be granted, see Fed. R. Civ. P. 12(b)(6); dismissed the Section 1981 and Section 1983 claims against these officials on the ground of qualified immunity; and dismissed the state law claims against these officials on the ground of official immunity. See Disparate Treatment Op., 683 F. Supp. 2d at 243-45, 269-72.[20] On their cross-appeal, the Intervenors challenge the immunity rulings, but not the Rule 12(b)(6) ruling, which was plainly correct, see Patterson v. County of Oneida, 375 F.3d 206, 221 (2d Cir. 2004) (individuals, as distinguished from employing entitles, not liable under Title VII).

Qualified immunity for federal law claims. The standards for qualified immunity are well settled. See Anderson v. Creighton, 483

[20] The District Court certified its dismissal ruling for immediate appeal under Fed. R. Civ. P. 54(b).

-38-

U.S. 635, 640 (1987); Mitchell v. Forsyth, 472 U.S. 511, 530-36 (1985); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

The District Court began its immunity analysis by observing that "to hold a supervisory official liable for violating § 1981 or the Equal Protection Clause, a plaintiff must 'prove that the defendant acted with discriminatory purpose.'" Disparate Treatment Op., 683 F. Supp. 2d at 270 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)). The Intervenors' theory of liability of the Mayor and the Commissioner was that, although neither had responsibility for preparation of the Exams, they both condoned their use, with awareness of their disparate impact, and did so despite warnings from the City's Equal Employment Practices Commission to take corrective action. With respect to this theory, the District Court stated, "The Intervenors have submitted copious evidence from which a reasonable fact-finder could infer that the Mayor and Commissioner harbored an intent to discriminate against black applicants . . . ." Id. Nevertheless, the Court upheld the officials' qualified immunity defense because "it would not have been clear to them from the governing legal precedent that such conduct violated § 1981 or the Equal Protection Clause." Id.

The Court did not mean that a public official would not have known that the official would violate Section 1981 or the Equal Protection Clause by intentionally taking adverse employment action on the basis of race. That obvious proposition has been clear at least since 1976, see Washington, 426 U.S. at 239-41. What would not be clear to the

-39-

officials, the District Court stated, was that the "Title VII burden-shifting analysis" would apply "to determine whether an _individual_, as opposed to a governmental employer, is liable for discrimination under either § 1961 or the Equal Protection Clause." Disparate Treatment Op., 683 F. Supp. 2d at 270 (emphasis in original).

In grounding qualified immunity on this rationale the District Court erred. The knowledge of a standard governing the conduct of public officials, required to defeat a claim of qualified immunity, is knowledge of primary conduct – action of an official that would violate constitutional limitations. It has nothing to do with secondary conduct of litigation of a claim of constitutional violation. Cf. Republic of Austria v. Altmann, 541 U.S. 677, 722 (2004) (Kennedy, J., with whom Rehnquist, C.J. and Thomas, J., join, dissenting) (distinguishing, for purposes of retroactivity, between statutes that "'regulate the secondary conduct of litigation and not the underlying primary conduct of the parties'") (quoting Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 951 (1997). If a public official intentionally acts to the detriment of current or prospective public employees on the basis of race, the official is not shielded by qualified immunity simply because the official might have been unaware that at trial a burden-shifting scheme would regulate the conduct of ensuing litigation. "For a constitutional right to be clearly established, _its_ contours must be sufficiently clear that reasonable official would understand that _what_

-40-

he is doing violates that right." <u>Hope v. Pelzer</u>, 536 U.S 730, 739-41 (2002) (emphases added) (internal quotation marks omitted).[21]

Having rejected the District Court's stated reason for dismissing the federal claims on the ground of qualified immunity, we next consider whether the record supports dismissal of these claims on the ground that the Intervenors have not shown a violation of a federal right. The District Court did not reach that component of qualified immunity, <u>see</u> <u>Siegert v. Gilley</u>, 500 U.S. 226, 232 (1991), accepting instead the opportunity created by <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009), to decide first whether the right alleged to have been violated was clearly established. <u>See</u> <u>Disparate Treatment Op.</u>, 683 F. Supp. 2d at 270 n. 32.

In considering whether the record would have permitted dismissal on the ground that the officials had not violated a federal right, we encounter two conflicting statements in the District Court's opinion. On the one hand, the Court referred to "copious evidence" from which a reasonable fact-finder could infer that the officials "harbored" an intent to discriminate against black applicants. <u>See</u> <u>Disparate Treatment Op.</u>, 683 F. Supp. 2d at 270. On the other hand, the Court stated that there was "no evidence that directly and unmistakably

---

[21] In any event, Title VII burden-shifting procedures have previously been applied to suits under both Section 1981, <u>see</u> <u>Hudson v. International Business Machines Corp.</u>, 620 F.2d 351, 354 (2d Cir. 1980), and Section 1983, <u>see</u> <u>Annis v. County of Westchester</u>, 136 F.3d 239, 245 (2d Cir. 1998).

proves that fact." Id.

We question both observations. As to the second one, there is no requirement that an intent to discriminate must be proved "directly and mistakably." Like any element in a civil case, the element of discriminatory intent need be proven only by a preponderance of the evidence. See Teamsters, 431 U.S. at 336. And intent, like any state of mind, may be proved by circumstances reasonably supporting an inference of the requisite intent. See, e.g., Blue v. Koren, 72 F.3d 1075, 184 (2d Cir. 1995) (requiring "particularized evidence of direct or circumstantial facts" bearing on improper motive in order to resist defendant's motion for summary judgment).

At the same time, we cannot agree with the District Court that the record revealed "copious evidence" of the officials' intent to discriminate. As the Supreme Court has recently observed, "[P]urposeful discrimination require more than intent as volition or intent as awareness of consequences. It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of [the action's] adverse effects upon an identifiable group." Iqbal, 556 U.S. at 676-77 (internal quotation marks and citation omitted; brackets in original); see Personnel Administrator v. Feeney, 442 U.S. 256, 279 (1979) (noting that "discriminatory purpose" implies not just that the decisionmaker possessed "intent as awareness of consequences" but that he "selected or reaffirmed a particular course of action at least in part because of, not merely in

-42-

spite of, its adverse effects upon an identifiable group") (internal quotation marks omitted). The record contains ample evidence of the officials' awareness of the disparate impact of the Exams, and they do not dispute such awareness. Whether it contains sufficient evidence that they undertook a course of action because of that impact requires further consideration.

Most of the evidence cited by the Intervenors to satisfy their burden of resisting the officials' motion for summary judgment concerns steps the officials did not take, rather than a "course of action" they undertook. For example, the Intervenors point to the failure to have the Exams validated prior to their continued use and their failure to move promptly to develop a new valid exam. Although we do not doubt that the failure of senior officials to act can support an inference of discriminatory intent in some circumstances, particularly where they are in a position to avoid likely unconstitutional consequences, see, e.g., United States ex rel. Larkins v. Oswald, 510 F.2d 583, 589 (2d Cir. 1975) (Corrections Commissioner liable for unwarranted solitary confinement of inmate), we do not believe that the cited omissions of the Mayor or the Commissioner suffice to support a reasonable inference that they declined to act because they wanted to discriminate against black applicants.

The principal evidence of a course of action arguably undertaken for the purpose of discrimination is the decision to continue using

the results of the Exams with awareness of their disparate impact. Although we disagree with the District Court that there was "copious evidence" of the officials' intent to discriminate, we cannot say that a reasonable fact-finder might not infer, from all the evidence, that, with respect to the Commissioner heading the FDNY, his involvement in the decision to continue using the results of the Exams indicated an intent to discriminate. Were the decision ours to make, we would not draw such an inference, but our task is the more limited one of determining whether such an inference could reasonably be made by the fact-finder. With respect to the Mayor, however, we think the record does not suffice to permit a fact-finder to draw a reasonable inference of intent to discriminate. In light of the myriad duties imposed upon the chief executive officer of a city of eight million people, more evidence would be needed to permit a trier to find that the decision of one municipal department to continue using the results of the Exams supports an inference of discriminatory intent on the part of the Mayor.

Official Immunity for state law claims. The common-law doctrine of official immunity shields public employees "from liability for discretionary actions taken during the performance of governmental functions" and "is intended to ensure that public servants are free to exercise their decision-making authority without interference from the courts." Valdez v. City of New York, 18 N.Y.3d 69, 75-76 (2011) (municipal immunity). Here, as explained by the District Court,

-44-

Disparate Treatment Op., 683 F. Supp. 2d at 270-72, the decision of two of the City's highest-ranking officials to continue hiring firefighters from eligibility lists based on the Exams involved discretionary decisionmaking.

We therefore affirm the District Court's decision to dismiss federal and state law claim against Mayor Bloomberg on the grounds of qualified and official immunity, affirm the decision to dismiss state law claims against Commissioner Scoppetta on the ground of official immunity, but vacate the decision to dismiss federal law claims against Commissioner Scoppetta on the grounds of qualified immunity.

IV. Scope of the Injunction

"[T]he scope of a district court's remedial powers under Title VII is determined by the purposes of the Act." Teamsters, 431 U.S. at 364. Congress enacted Title VII to achieve equal employment opportunities and "to eliminate those discretionary practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." McDonnell Douglas, 411 U.S. at 800. "Congress deliberately gave the district courts broad authority under Title VII to fashion the most complete relief possible." Local 28 Sheet Metal Workers' International Ass'n v. EEOC, 478 U.S. 421, 465 (1986). Once liability for racial discrimination has been established, a district court has the duty to render a decree that will eliminate the discretionary effects of past discrimination and prevent like discrimination in the future. See Albemarle Paper Co., 422 U.S. at

-45-

418; <u>Bridgeport Guardians, Inc. v. City of Bridgeport</u>, 933 F.2d 1140, 1149 (2d Cir. 1991). Although a court's power to fashion appropriate relief is not unlimited, <u>see</u> <u>Bridgeport Guardians</u>, 933 F.2d at 1149, we have held that, when it appear "that the employer has discriminated prior to the use of the challenged selection procedure, then it may also be appropriate to fashion some form of affirmative relief, on an interim and long-term basis, to remedy past violations," <u>NYC Guardians</u>, 630 F.2d at 108.

The District Court expressed the view that its conclusion concerning the need for "close and continuing supervision" is "as applicable to City's violation of the disparate impact provisions of Title VII as it is to the City's intentional discrimination against black firefighter candidates." <u>City of New York</u>, 2011 WL 4639832, at *11 (E.D.N.Y. Oct. 5, 2011). The Intervenors endorse this view and, somewhat extending it, suggest that we should uphold all provisions of the injunction solely on the basis of the unchallenged disparate impact ruling. The City contends that the District court exceeded its discretion by entering an injunction that goes beyond the scope of the Title VII disparate impact violation. In the City's view, the only provisions of the injunction that may be sustained as relief for its disparate impact liability are those that require a lawful method of testing and a limitation on interim hiring until a valid exam is

-46-

prepared.[22] Any more intrusive remedies, the City argues, are not warranted in the absence of a valid finding of a pattern or practice of intentional discrimination, and perhaps not even then.

We disagree with the positions of both sides. We think that in some respects the injunction contains provisions that go beyond what would be appropriate to remedy only the disparate impact liability, and, because we have vacated the ruling granting summary judgment for the Intervenors on the disparate treatment claim, we will uphold only those provisions of the injunction that are appropriate as relief for the City's liability on the Government's disparate impact claim. On the other hand, whatever the dimensions of an appropriate remedy for a straightforward case involving only the disparate impact of a hiring exam, considerably more relief is warranted in this case in light of the distressing pattern of limited FDNY minority hiring. Even after the 1973 determination that a hiring exam was invalid because of a racially disparate impact, see Vulcan Society of New York City Fire Dep't, 360 F. Supp. at 1269, the City's percentage of black entry-level firefighters has remained at or below 4 percent for several decades, and the current percentage of 3.4 percent compares woefully to the 16.6 percent achieved by the city's Police Department and the 61.4 percent achieved by the City's Corrections Department. Although

----

[22] We note that the District Court recently approved the City's use of the results of a new exam for entry-level firefighters. See United States v. City of New York, No. 07-CV-2067, 2012 WL 4503253 (Sept. 28, 2012).

-47-

some provisions of the injunction cannot be justified in the absence of a finding of discriminatory intent, many provisions are well within the District Court's discretion as a remedy for discriminatory impact liability in view of the history of minority hiring by the FDNY and the City's recalcitrance in undertaking remedial steps.

The "General Terms" of the Injunction enjoin the use of the challenged exams and prospectively prohibit discrimination against black or Hispanic applicants for the position of entry-level firefighter. See Injunction Op., 2011 WL 6131136, at *4. The "Specific Remedial Measures" section of the Injunction focuses on five substantive areas: Firefighter Test Development and Administration, Firefighter Candidate Recruitment, Attrition Mitigation Plan and Reassessment of Entry-Level Firefighter Selection, Post-Examination Firefighter Candidate Screening, and EEO Compliance Reform. Id. at *4-*13.

We describe the specific provisions of the injunction in abbreviated form.[23] Paragraph 14[24] bars the use of Exams 7029, 2043, and 6019,[25] and paragraph 15 bars the use of any exam with a disparate impact against blacks or Hispanics that is not job-related.

_____

[23] The wording of these summary statements is not to be understood as varying the specific terms of the injunction.

[24] Paragraphs 1-13 define terms used in the injunction.

[25] The injunction's prohibition of the use of Exam 6019 replaces the interim permission previously given to use that exam.

Paragraph 16 requires approval of the Monitor before taking any step in the hiring process.

Paragraph 17 bars retaliation for complaining against discrimination. Paragraph 18 bars discrimination against black or Hispanic firefighter candidates. The first sentence of paragraph 19 requires the elimination of all vestiges of intentional discrimination; the second sentence requires the elimination of all policies and practices that have a discriminatory impact on black and Hispanic firefighter candidates.

Paragraph 20 requires compliance with the instuction of the Monitor.

Paragraph 21 specifies, with certain exceptions, that all required submissions be signed by the fire Commissioner and the Corporation Counsel and be reviewed and approved by the Mayor.

Paragraphs 22-24 require prior notice to the Monitor and the parties concerning new hiring and details of the preparation of new eligibility lists.

Paragraphs 25-30 require recruitment efforts, including the hiring of a recruitment consultant, the preparation of a recruitment report, and either compliance with the consultant's recommendations or an explanation for not following them.

Paragraphs 31-36 require steps to mitigate attrition during the selection process.

Paragraphs 37-46 require various steps to be taken after exams are

-49-

administered.  Paragraphs 37 and 38 require a detailed written record of any oral conversations that concern a candidate.  Paragraph 39 requires designation of a senior official to enforce the writing requirement.  Paragraphs 40 and 41 require written procedures for conducting background investigations of candidates.

Paragraphs 47-51 require various steps, including appointment of an EEO consultant, to assure compliance with equal employment opportunity requirements.

Paragraphs 52 and 53 require development of and compliance with a document retention policy.  Paragraphs 54 and 55 require discovery through document production and deposition availability to assure compliance with the injunction.

Paragraph 56 authorizes sanctions for noncompliance.

Paragraphs 57-77 appoint Mark S. Cohen as Monitor, specify his duties, and authorize necessary staff.

Paragraphs 78-80 provide for the retention of jurisdiction until at least January 1, 2022.  Paragraphs 81 and 82 require the City to pay costs, attorney's fees, and all expenses.

After reviewing these provisions in light of the unchallenged disparate impact finding, the absence (as yet) of a proper disparate treatment finding, the FDNY's record of minimal minority hiring, and the District Court's broad, but not limitless, discretion in fashioning appropriate relief, we conclude that the principal components of the injunction are appropriate, but that several

-50-

modifications must be made.

In addition to proscribing use of the invalid exams and preparation of valid exams, the District Court was entirely warranted in ordering significant affirmative relief (although declining to order any hiring quota), including appointing a Monitor to oversee the FDNY's long-awaited progress toward ending discrimination, ordering development of policies to assure compliance with anti-discrimination requirements, requiring efforts to recruit minority applicants, ordering steps to lessen minority attrition, ordering a document retention policy, and requiring comprehensive review of the entire process of selecting entry-level firefighters. However, we believe several provisions must be modified or deleted, primarily because of our vacating the grant of summary judgment on the disparate treatment claim.

Paragraph 19 must be modified to delete the first sentence, which is based on a finding of intentional discrimination that we have vacated subject to further proceedings. The second sentence generally barring policies and practices with a disparate impact must also be modified to bar only those policies and practices not job-related or required by business necessity.

Paragraph 21 must be modified to eliminate approval of submissions by the Corporation Counsel, who is not a party to this litigation, and the Mayor, whose dismissal we have affirmed. Although we can understand the District Court's concern in litigation against the City to have the City's chief executive officer and chief legal officer

assume direct responsibility for all submissions, these requirements are an excessive intrusion into the duties of officials charged with citywide responsibilities, in the absence of either their liability or an indication that imposing requirements on the head of the relevant department will be inadequate.

Paragraphs 26-29 must be modified to eliminate the requirement of an outside recruitment consultant and, instead, to assign the consultant's tasks to appropriate City employees. Although the record warrants performance of these tasks, it does not require burdening the City with the extra expenses of an outside consultant. In the event that the Monitor determines that designated City employees are not adequately performing their functions, he may apply to the Court for designation of an outside consultant. Paragraph 29 must be further modified, for the same reason applicable to paragraph 21, to eliminate the requirement of the Mayor's approval.

Paragraphs 34-36 must be modified, for the same reason applicable to paragraph 21, to eliminate the Mayor's obligations and substitute those of the Fire Commissioner.

Paragraphs 37-39 must be eliminated. The requirement of contemporaneous written records of all communications concerning hiring is far too intrusive, at least in the absence of a finding of intentional discrimination.

Paragraphs 40 and 41 must be modified to eliminate, as too intrusive, the detailed requirements for CID and PRB policies and

procedures; the requirement of developing written procedures that are subject to the Monitor's approval remains.

Paragraph 42 must be eliminated, for the same reason applicable to paragraphs 26-29.

Paragraph 43 must be eliminated as imposing too great a burden on the Monitor, although the Monitor will remain eligible to attend any PRB meeting.

Paragraph 45 must be modified, for the same reason applicable to paragraph 21, to eliminate the requirement of the Mayor's signature and certification.

Paragraphs 47-51 must be modified, for the same reason applicable to Paragraphs 26-29, to eliminate the requirement of an outside EEO consultant and to assign the consultant's tasks to the FDNY's EEO Office. In the event that the Monitor determines that designated City employees are not adequately performing their functions, he may apply to the Court for designation of an outside consultant. Paragraph 50 must be further modified, for the same reason applicable to Paragraph 21, to eliminate the requirement of the Mayor's signature and certification.

Paragraph 54 must be modified to change "any additional document" to "any non-privileged documents."

Paragraphs 66 and 68 must be modified to change "short notice" to "reasonable notice," and paragraph 67 must be modified to change "one week" to 30 days."

Paragraph 71 must be modified to add "The City may apply to the Court, upon reasonable notice to the parties, to end the employment of some or all of the Monitor's staff and consultants upon a demonstration that the City has satisfied its burden of proof as specified in modified Paragraph 78."

Paragraph 78 must be modified to change "and nor" to "nor" in subparagraph (a), and to eliminate subparagraphs (e) and (f) concerning intentional discrimination.

Paragraph 79 must be modified in subparagraph (a) to change "2022" to "2017,", and subparagraph (b) must be modified to change "second of the City's next two civil service hiring lists" to "City's next civil service hiring list." An extended retention of jurisdiction is not warranted in the absence of a finding of intentional discrimination.[26]

Paragraph 80 must be eliminated. The City is entitled to undertake to satisfy its burden of proof to be relieved of the injunction's prospective requirements whenever it believes it can do so.

Paragraph 83 must be modified to change "and disparate treatment claims that were" in line 3 to "claim that was,"; to change "and Disparate Treatment Opinions" in lines 4-5 to "Opinion"; and, to

---

[26] We note that the District Court previously stated, "If after the bench trial the court concludes that the City has shown that, among other things, it has ended its discriminatory hiring practices and taken sufficient affirmative measures to end the policies and practices that have perpetuated the harmful effects of those discriminatory hiring practices and procedures, the court will relinquish jurisdiction." City of New York, 2011 WL 4639832, at *15.

-54-

change "those claims" in line 8 to "that claim."

Although we have made several modifications, primarily in view of the fact that a proper finding of intentional discrimination has not been made, we leave in place the many provisions that the District Court has wisely required in order not only to remedy the disparate impact of the challenged exams and but also to put the FDNY on a course toward future compliance with Title VII.

As modified, the injunction is affirmed.[27]

## V. The City's Claim for Reassignment to a Different Judge

The City contends that, in the event of a remand, the case should be reassigned to a different district judge because of what it alleges is bias on the part of Judge Garaufis. That is an extreme remedy, rarely imposed, see United States v. Jacobs, 955 F.2d 7, 10 (2d Cir. 1992) (reassignment is an "extraordinary remedy" reserved for the "extraordinary case") (internal quotation marks omitted), but occasionally warranted, even in the absence of bias, to avoid an appearance of partiality, see Hispanics for Fair & Equitable Reapportionment v. Griffin, 958 F.2d 24, 26 (2d Cir. 1992) ("firmness" of judge's views warranted reassignment on remand to assure "appearance of justice"); United States v. Robin, 553 F.2d 8, 10 (2d Cir. 1977) (in banc) ("Absent proof of personal bias . . . reassignment is advisable to preserve the appearance of justice . . . .").

---

[27] We assume the District Court will enter a new injunction reflecting the modifications we have required.

Although the District Judge expressed several criticisms of the FDNY, we see no basis to require reassignment of the entire case to a different judge. However, one aspect of the Judge's handling of the case thus far warrants a limited form of reassignment. In granting summary judgment ro the Intervenors on their pattern-or-practice discriminatory treatment claim, Judge Garaufis stated that the City's rebuttal evidence in opposition to that claim was "either incredible or inapposite." Disparate Treatment Op., 683 F. Supp. 2d at 266.

This assessment is cause for concern for two reasons. First, in considering the sufficiency of the City's rebuttal evidence, the District Court's task was only to determine whether the City's rebuttal evidence satisfied the City's burden of production. But the Court went beyond that task and granted summary judgment to the Intervenors. Although summary judgment at the preliminary stage might be proper in a rare case, the Intervenors have not cited any case, and we have found none, in which an employer's rebuttal evidence in a discriminatory treatment case resulted in a summary judgment for the plaintiff. Second, and more important, it was improper for the District Court to make any assessment of credibility in considering the sufficiency of the City's rebuttal to the Intervenors' prima facie case. See Hicks, 509 U.S. at 509 (determining whether a defendant has satisfied its burden of production "can involve no credibility assessment"). The Court not only assessed credibility but did so after considering only affidavits.

We have no doubt that Judge Garaufis is an entirely fair-minded jurist who could impartially adjudicate the remaining issues in this case, but we think a reasonable observer would have substantial doubts whether the judge, having branded the City's evidence "incredible," could thereafter be impartial in assessing the truth of conflicting evidence at a bench trial, the parties having waived a jury trial. Of course, if any judge were to find a witness's testimony incredible when appropriately acting as a bench trial finder of fact, that would not prevent that judge from determining the facts at future bench trials at which that same witness will testify, even though a similar assessment of the witness's credibility would be likely. Defendants relying on the same witness in a succession of separate bench trials are not entitled to a succession of different trial judges just because their witness was disbelieved at the first trial. But where, as here, a judge makes an unwarranted venture into fact-finding at a preliminary stage and brands a party's evidence as "incredible" without hearing any witnesses, an objective observer would have a reasonable basis to question the judge's impartiality in assessing that evidence at trial.[28] See Pescatore v. Pan American World Airways, Inc., 97 F.3d 1, 21 (2d Cir. 1996) ("To reassign a case on remand, we need not find actual bias or prejudice, but only that the facts might

_____

[28] We note that this is the unusual case where the risk of an appearance of partiality is identified on an interlocutory appeal at a preliminary stage of the litigation and can be avoided prospectively without undoing a proceeding already concluded.

reasonably cause an objective observer to question [the judge's] impartiality.") (internal quotation marks omitted).

This conclusion, however, does not warrant the City's requested relief of reassigning the entire case to a different judge. The appearance of impartiality would be limited to Judge Garaufis's conduct of a bench trial on the liability phase of the Intervenors' remanded disparate treatment claim, and it is only that phase of the future proceedings that needs to be conducted by a different judge.

This reassignment of a portion of the case to a different judge will potentially create an issue as to implementation of injunctive relief. The District Court will need to (1) supervise implementation of the portions of the injunction we have affirmed with respect to the Government's disparate impact claim and, if the Intervenors pursue and prevail on their disparate treatment claim, (2) fashion any additional relief that might be warranted and supervise the implementation of any such relief. We leave to the District Court the task of determining the appropriate supervision role or roles of Judge Garaufis and/or whichever judge is assigned to preside at the trial of the liability phase of the disparate treatment claim. In the unlikely event that these two judges cannot agree on their appropriate roles, any party may apply to this Court for further relief. Pending a ruling in favor of the Intervenors on their disparate treatment claim, if pursued, Judge Garaufis may continue supervising implementation of the portions of the injunction we have affirmed.

The federal rules permit separate trials of separate issues, see Fed. R. Civ. P. 42(b), and we see no obstacle to having a second judge try a separate issue where a bench trial of that issue by the first judge risks an appearance of partiality.[29]

## Conclusion

The grant of summary judgment to the Intervenors on their disparate treatment claim is vacated; the dismissal of the federal and state law claims against Mayor Bloomberg is affirmed, as is the dismissal of the state law claims against Commissioner Scoppetta; the dismissal of the federal law claims against Commissioner Scoppetta is vacated; the injunction is modified and, as modified, is affirmed; and the case is remanded with directions that the bench trial on the liability phase of the Intervenors' disparate treatment claim against the City will be reassigned to a different district judge.

Affirmed in part, vacated in part, and remanded.

---

[29] Dividing aspects of a single case between two judge of the same court is doubtless unusual, but our Court has taken the even more unusual course of sending bifurcated issues in a single case to two different courts. When the Temporary Emergency Court of Appeals ("TECA") existed for handling appeals concerning issues arising under the Economic Stabilization Act ("ESA"), our Court divided appeals containing such issues and sent the ESA issues to the TECA court and kept the remaining issues (often antitrust issues) in our Court. See Coastal States Marketing, Inc. v. New England Petroleum Corp., 604 F.2d 179, 186-87 (2d Cir. 1979).

POOLER, *Circuit Judge*, dissenting:

I concur in the majority opinion in its statements of the controlling law and conclusions in Parts I, III, IV, and V. I respectfully dissent however, as to Part II, because I believe that the majority incorrectly applies the standard for cases involving an individual Title VII violation to this pattern-or-practice case. By requiring the City merely "to articulate some legitimate, nondiscriminatory reason" for the adverse action as set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), rather than demand it "demonstrat[e] that the [plaintiff's] proof is either inaccurate or insignificant" as required by *International Brotherhood of Teamsters v. United States* (*Teamsters*), 431 U.S. 324, 360 (1977), the majority conflates the two distinct tests set out in our disparate treatment jurisprudence.[1]

## I. Two Different Burden-Shifting Frameworks: *McDonnell Douglas* and *Teamsters*

The Supreme Court has "devised a series of shifting evidentiary burdens" for the different types of disparate treatment claims under Title VII "that are intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988) (internal citation and quotation marks omitted). In *McDonnell Douglas*, 411 U.S. at 802, the Court set out the burdens for individual claims, and in *Teamsters*, 431 U.S. at 336, it established the analysis for pattern-or-practice claims. *See Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 157 n.3 (2d Cir. 2001). "The *McDonnell Douglas* and *Teamsters* frameworks differ in important respects." *Reynolds v. Barrett*, 685 F.3d 193, 204 (2d Cir. 2012). Although their structures are essentially the same,

---

[1] Concluding the district court correctly applied *Teamsters* in its grant of summary judgment, I believe reassignment to a different district judge is unnecessary, however, I nonetheless concur with the majority opinion's conclusion in Part V.

1

"the content of the specific stages" of these frameworks are "different." *Coates v. Johnson &*

*Johnson*, 756 F.2d 524, 532 (7th Cir. 1985). These differences exist to address the distinct

purposes of the separate types of claims.

Individual suits aim to uncover discrimination where a plaintiff "has been subjected to

'disparate treatment' because of his race." *Furnco Constr. Corp v. Waters*, 438 U.S. 567, 582

(1979) (Marshall, J., concurring in part, dissenting in part). Under the *McDonnell Douglas*

framework the individual plaintiff is required to show that "(1) he is a member of a protected

class; (2) he was qualified for the position he held; (3) he suffered an adverse employment

action; and (4) the adverse action took place under circumstances giving rise to [an] inference of

discrimination." *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010); *see also*

*McDonnell Douglas*, 411 U.S. at 802. If the plaintiff establishes its prima facie case, the burden

then shifts to the employer who need only "articulate some legitimate, nondiscriminatory reason

for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. If the employer is able to

satisfy that burden, the inquiry then returns to the plaintiff, to demonstrate that the proffered

reason is a pretext for discrimination. *Id*. at 804.

In contrast, the Supreme Court announced in *Teamsters* that "pattern-or-practice" claims

brought under Section 707 of Title VII[2] aim to thwart widespread procedures that fall harshly on

one racial group rather than mere isolated instances. *Teamsters*, 431 U.S. at 336 n.16. Unlike

*McDonnell Douglas*, the plaintiff must make a prima facie showing of pattern-or-practice under

---

[2] Pattern-or-practice claims originate from section 707(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-6(a), which states where "persons [are] engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights" the Attorney General may bring a civil action.

*Teamsters* "that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers." *Teamsters*, 431 U.S. at 360. If the plaintiff meets its initial burden, the employer must then "defeat" that showing by "demonstrating that the Government's proof is either *inaccurate or insignificant*." *Id.* (emphasis added). If the employer fails to satisfy its burden of production, the suit then concludes the liability phase and enters the remedial phase. *Id*. at 361. If the defendant satisfies the burden of production, the district court "must then determine, by a preponderance of the evidence, whether the employer engaged in a pattern or practice" in order for it to "fashion class-wide injunctive relief." *Reynolds*, 685 F.3d at 203 (internal quotation marks and citations omitted).

*Teamsters*' detailed scheme differs from that of *McDonnell Douglas* in two important respects with regards to this case. First, unlike a plaintiff bringing an individual claim under *McDonnell Douglas*, a plaintiff establishing a prima facie case of pattern-or-practice is often required to use statistics. *Id.* at 339 (stating statistics have and will continue to serve an important role in pattern-or-practice cases); *see also Robinson*, 267 F.3d at 157 n.3. Second, in a pattern-or-practice case governed by *Teamsters*, the defendant must also satisfy a more difficult burden by responding to the plaintiffs' prima facie case. Thus, where a plaintiff used statistical evidence to prevail, a *Teamsters* defendant may not merely "articulate some legitimate, nondiscriminatory reason" for the alleged discrimination, as required under *McDonnell Douglas*, 411 U.S. at 802, instead the employer must "meet" the Government's proof, *Teamsters*, 431 U.S. at 360 n.46, by demonstrating the plaintiff's statistics were inaccurate or insignificant. *Id.* at

3

360.[3] Thus, the burdens of proof for both plaintiff and defendant are heavier under *Teamsters*.[4]

To understand the reasoning underlying *Teamsters'* more demanding standards for plaintiffs and defendants, in comparison to that under *McDonnell Douglas*, we need only observe the separate types of discrimination they aim to end. In an individual claim, the targeted behavior involves instances of discrimination against a particular plaintiff. *Reynolds*, 685 F.3d at 203-04. Thus, statistical evidence is not necessary or, in fact, helpful in establishing these particular occurrences. *Id.*; *see also Hudson v. Int'l Bus. Mach. Corp.*, 620 F.2d 351, 355 (2d Cir. 1980). In general, the plaintiff's prima facie burden under *McDonnell Douglas* has been characterized as "not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253

---

[3] The majority claims this sentence incorrectly substitutes the word "statistics" for "proof." Maj. Op. at 25-26 n.13. However, I agree that *Teamsters* requires the defendant meet the Government's "proof" and have stated this point above. Rather than incorrectly replace "proof" with the word "statistics" this sentence only reveals the further logical deduction that the defendant must meet the plaintiff's *statistical* proof. It explains this point in the context of the paragraph's syllogism. The syllogism proceeds from *Teamsters* as follows: 1) Under *Teamsters* a defendant has the "rebuttal burden of showing that the plaintiff's prima facie proof lacked significance," a point with which the majority agrees, Maj. Op. at 25-26 n.13; 2) In pattern-or-practice cases the plaintiff's proof is often composed of statistics, as was the case here. Ergo, 3) in such cases the defendant's obligation is to meet *that proof*, by defeating the meaning of those statistics. Thus the use of "statistics" rather than "proof" in this context is a far cry from a conflation and instead is the result of a logical conclusion.

[4] In addition to these two main differences, to remedy the particular harm at which they are aimed, pattern-or-practice claims authorize a specific form of injunctive relief against an employer "to the full enjoyment of any of the rights secured by the statute." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 146-48 (2d Cir. 2012) (citing 42 U.S.C. § 2000e-6) (internal quotation marks omitted). If the district court can fashion class-wide prospective relief, including "an injunctive order against continuation of the discriminatory practice, an order that the employer keep records of its future employment decisions and file periodic reports with the court, or any other order necessary to ensure the full enjoyment of the rights protected by Title VII." *Teamsters*, 431 U.S. at 361 (internal quotation marks omitted). Thus, pattern-or-practice plaintiffs seek different relief, unlike plaintiffs seeking individualized relief who assert "back pay, front pay, or compensatory recovery." *Reynolds*, 685 F.3d at 203 (internal citation and quotation marks omitted).

4

(1981). Similarly, a *McDonnell Douglas* defendant's burden is less demanding—being able to merely present a legitimate neutral reason—where there are no statistics to controvert. For example, it is sufficient if the defendant's evidence simply sets forth "the reasons for the plaintiff's rejection." *Id.* at 255.

In contrast, the "essence" of pattern-or-practice claims is different because they aim to end discrimination of a different kind. These claims address cases where "the employer treated all members of the class in the same way," so "the manner of proving [*and* defeating] the claim usually relies heavily on statistical evidence, bolstered as necessary with anecdotal evidence." 1 Arthur Larson et al., *Employment Discrimination* § 8.02, at 8-15 (2d ed. 2012) (hereinafter "Larson"). As the Supreme Court underscored in *Teamsters*, statistical evidence is often necessary in proving pattern-or-practice cases because plaintiffs must prove more than mere "sporadic acts of discrimination; rather, they must establish that intentional discrimination was the defendant's 'standard operating procedure.'" *Robinson*, 267 F.3d at 158 (quoting *Teamsters*, 431 U.S. at 336). Once the plaintiff has used statistical evidence to make out its prima facie case, the employer must then "defeat the prima facie showing" by addressing those statistics. *Teamsters*, 431 U.S. at 360. Although there are no "limits on the type of evidence an employer may use," because the employer must "meet" the plaintiff's case and demonstrate that it is inaccurate or insignificant, *id.* at 360 n.46, if statistics were used, those statistics must necessarily be addressed.

The *Teamsters* burden on the employer is carefully calibrated to identify widespread discriminatory acts; thus, an employer's noncompliance with this test is an attempt to evade its purposes. The burden shifting framework "'is a *procedural* device, designed . . . to establish an

order and proof of production,' and, like other procedural rules, [it] subjects noncompliant parties to default regardless of the objective merit of their claims or defenses." Dist. Ct. Op. at 36 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 522 (1993) (emphasis in original)). Similarly, as it fails to address the pattern-or-practice concerns, using the "ill-suited" *McDonnell Douglas* pattern of proof is likewise inappropriate. *Robinson*, 267 F.3d at 157 n.3 (quoting 1 Arthur Larson et al., *Employment Discrimination* § 8.01[4], at 8-13 (2d ed. 2001)). As one Court put it: "In a complex class action, utilizing statistical proof and counterproof, the value of the [*McDonnell Douglas*] sequence—to highlight the issues in contrast—is about as relevant as a minuet is to a thermonuclear battle." *Vuyanich v. Republic Nat'l Bank*, 521 F. Supp. 656, 661 (N.D. Tex. 1981), *vacated on other grounds*, 723 F.2d 1195 (5th Cir. 1984). Thus, an employer who attempts to displace the *Teamsters* requirement with *McDonnell Douglas* proof must fail.

Courts have continuously acknowledged these differences between *Teamsters* and *McDonnell Douglas*. For example, the year following its opinion in *Teamsters*, the Supreme Court reiterated the distinction between *McDonnell Douglas* and *Teamsters* in Title VII cases. *Waters*, 438 U.S. at 575. In *Waters*, a suit brought by three *individuals* the Court found that it was necessary to apply the "approach . . . contained in *McDonnell Douglas*" because it "was not a 'pattern or practice' case like *Teamsters v. United States* . . . ." *Id.* at 575 & n.7; *see also Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984) (distinguishing *Teamsters* and *McDonnell Douglas* in a case contemplating additional proceedings to determine the scope of individual relief).

6

This Circuit has authoritatively held that *Teamsters* establishes the approach for pattern-or-practice cases, distinct from that of *McDonnell Douglas*.[5] In *Robinson*, this Circuit enunciated that "Title VII disparate treatment claims are of two types," either individual claims to be analyzed under *McDonnell Douglas* or pattern-or-practice claims brought under *Teamsters*. *Reynolds*, 685 F.3d at 202 (citing *Robinson*, 267 F.3d at 157 n.3). We have since reiterated *Robinson*'s holding that *Teamsters* established the distinct test for pattern-or-practice claims in subsequent cases. *See Reynolds*, 685 F.3d at 202; *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 146-50 (2d Cir. 2012). Lower courts in this Circuit have also diligently adopted our approach, *see, e.g.*, *Lomotey v. Conn., Dep't of Transp.*, 2012 WL 642763, at *12 (D. Conn. Feb. 28, 2012) (stating that *Teamsters* is distinguishable from *McDonnell Douglas* framework); *EEOC v. Bloomberg L.P.*, 778 F. Supp. 2d 458, 468 (S.D.N.Y. 2011) (same); *United States v. N.Y.C. Transit Auth.*, 2010 WL 3855191, at *23 (E.D.N.Y. Sept. 28, 2010) (applying *Teamsters* to this pattern-or-practice case and stating that "the *McDonnell Douglas* framework does not apply in Section 707 cases"); *United States v. City of New York*, 631 F. Supp. 2d 419, 427 (S.D.N.Y. 2009) (collecting cases for the proposition that individuals cannot bring pattern-or-practice cases), and at least one other Circuit has recognized *Robinson*'s change to our law, *see, e.g.*, *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 179 n.11 (3rd Cir. 2009) (noting that more recently "courts of appeals have used the *Teamsters* two-stage framework to analyze

---

[5] Although our earlier cases immediately following *Teamsters* applied both the *McDonnell Douglas* and *Teamsters* tests to pattern-or-practice cases without distinguishing them, *Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 370 (2d Cir. 1989); *Woodbury v. N.Y.C. Transit Auth.*, 832 F.2d 764, 768-69 (2d Cir. 1987); *Ste. Marie v. E. R.R. Ass'n.*, 650 F.2d 395, 397 (2d Cir. 1981), this Court subsequently allayed any concerns over confusion between the two by definitively holding that the *Teamsters* framework sets distinct standards for pattern-or-practice claims. *Robinson*, 267 F.3d at 159-60.

7

pattern-or-practice claims brought as private-plaintiff class actions under Title VII" and citing to *Robinson*, 267 F.3d at 158-60).

In addition to recognizing these general differences, this Court went even further in *Reynolds v. Barrett* and underscored that *Robinson* also adopted one of the most predominant differences between the tests: unlike the *McDonnell Douglas* burden-shifting framework, the employer under *Teamsters* must "show that the statistical evidence proffered by the plaintiffs is insignificant or inaccurate." *Reynolds*, 685 F.3d at 203. "Typically, this is accomplished by challenging the source, accuracy, or probative force of the plaintiffs' statistics." *Id.* (internal quotation marks and citation omitted). Thus, the "prudent defendant will follow all three routes if possible, presenting its own version of the numbers game, attempting to undermine the plaintiffs' version with specific attacks on the validity of the plaintiffs' statistics, and garnering non-statistical evidentiary support as well." *Robinson*, 267 F.3d at 159 (internal citation and alterations omitted).

*Robinson* thus emphasized the two differing aspects of the employer's burden under *Teamsters* that are at issue today. First, the requirement that the employer show "insignificance or inaccuracy" is a much more difficult bar than merely proffering some non-pretextual reason for discrimination as required by *McDonnell Douglas*. Second, also unlike *McDonnell Douglas*, this more difficult task under *Teamsters* must often be achieved by responding to the plaintiff's statistical proof. In essence, there is a statistical bind inherent in pattern-or-practice cases. Because the plaintiff's proof will often be composed of statistics, and the employer must "demonstrat[e] that the [prima facie] proof is either inaccurate or insignificant," *Teamsters*, 431

8

U.S. at 360, the employer is often required to defeat the plaintiff's statistical evidence.[6]

Consistent with our interpretation in *Robinson* and *Reynolds*, our sister Circuits have similarly upheld *Teamsters*' distinct analysis. Indeed, every Circuit, save the First and Federal Circuits, has decided cases specifically quoting that the employer's burden under *Teamsters* is to demonstrate that the plaintiff's offered proof is "inaccurate or insignificant." *See Hohider*, 574 F.3d at 177-78; *Morgan v. United Parcel Serv. of Am., Inc.*, 380 F.3d 459, 463-64 (8th Cir. 2004); *Beck v. Boeing Co.*, 60 F. App'x 38, 39 (9th Cir. 2003); *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1106 (10th Cir. 2001); *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1287 n.22 (11th Cir. 2000); *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1285 (5th Cir. 1994); *EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, 308 (7th Cir. 1988); *Ardrey v. United Parcel Serv.*, 798 F.2d 679, 683 (4th Cir. 1986); *Segar v. Smith*, 738 F.2d 1249, 1300-01 (D.C. Cir. 1984); *Alexander v. Aero Lodge No. 735, Int'l Ass'n of Machinists and Aerospace Workers*, 565 F.2d 1364, 1382 n.11 (6th Cir. 1977), *superceded by statute on other grounds*.

## II. The District Court Correctly Applied *Teamsters*

Thus, adhering to this unanimous recognition of *Teamsters* by this Circuit and others, the district court in this case faithfully applied the distinct pattern-or-practice test and found the City did not meet its more difficult burden. To begin its discussion, the district court announced that

---

[6] This Court's prescriptions in *Reynolds* and *Robinson* acknowledge the statistical bind that *most* employers will face. In these cases, the Court stated that challenging the statistical proof would be "[t]ypical[]" or the "basic" form of rebuttal. *Reynolds*, 685 F.3d at 203; *Robinson*, 267 F.3d at 159 (internal citation omitted). Thus, *Reynolds* and *Robinson* recognize that *Teamsters* allows for non-statistical evidence, but these cases also recognize that the employer's proof will rarely, if ever, be exclusively non-statistical. They notice that in most pattern-or-practice cases the plaintiff's proof will need to consist of statistics to show widespread discrimination, *Teamsters*, 431 U.S. at 339-40 n.20, and therefore the employer will have to answer that evidence with more than just non-statistical proof.

9

the Intervenors clearly met their burden by presenting "sufficient undisputed statistical evidence to support a prima facie case that the City had a pattern or practice of discriminating against black applicants." Dist. Ct. Op 28-29.[7] Not only did the statistics bear out that the City's use of its two Exams on a pass/fail basis and the rank order processing yielded "statistically significant adverse effects on black candidates," *id.* at 29, but the Intervenors also "supplemented their statistical showing with extensive historical, anecdotal, and testimonial evidence that the intentional discrimination was the City's standard operating procedure" for several decades, *id.* at 31 (internal quotation marks omitted).

Finding the prima facie burden had been met, the district court then moved on to the *Teamsters* requirement enunciated in *Robinson* that "the City bears the burden of 'demonstrating that the [Intervenors'] proof is either inaccurate or insignificant' by attacking its 'source, accuracy, or probative force.'" *Id.* at 33 (citing *Robinson*, 267 F.3d at 159). Having failed to "dispute either the accuracy or practical significance of Plaintiffs' statistical analyses," *id.* at 7, the district court found the City to have "abjured [its *Teamsters*] responsibility entirely," *id.* at 33. The court stated, "[t]he City has not offered a competing 'statistical summary treatment of the protected class,' has not attempted to undermine the Intervenors' statistics with 'specific attacks on their validity,' and has garnered no 'anecdotal or other non-statistical evidence tending to rebut the inference of discrimination.'" *Id.* (internal alterations and citations omitted).

---

[7] For example, the court found plaintiffs proved their burden by showing that (1) the application of the pass/fail policy to Exam 7029 and Exam 2403 had a net effect of eliminating "between 607 and 684 black applicants who would not have failed the Exams but for the disparity" and also kept 144 black firefighters from gaining appointments they would have otherwise received, and (2) the rank-ordering of the examinations had the net effect of denying 112 black applicants "approximately 34 years' worth of wages and seniority that they would have received absent the policy's disparate effects." Dist. Ct. Op. at 29-30.

Thus, despite *Robinson*'s suggestion that "the prudent defendant will follow all three routes," 267 F.3d at 159 (internal citation omitted), here, the lower court correctly found that the City attempted to "circumvent its burden of production entirely." Dist. Ct. Op. at 33.

Rather than responding to the statistical evidence, the City only "argu[ed] that the Intervenors ha[d] not proved that the City harbored a subjective intent to discriminate against black applicants." *Id.* In essence, the City ignored the inevitable conclusion of the statistics and tried to focus on intent. But, "[a]t this stage, lack of direct proof regarding the employer's mental state is simply immaterial to the question of whether the City can rebut the presumption of unlawful discrimination created by the Intervenors' prima facie showing." *Id.* at 37. Despite the City's correct assertion that what "actually motivate[s] the employer's decision" is relevant, *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993), departure from the *Teamsters* framework is "fatal" where the motivation did not address the statistical evidence. Dist. Ct. Op. at 35.

In the face of the district court's faithful application of the law, the majority not only overrules that well-reasoned decision but also confuses the distinct pattern-or-practice standard by incorrectly conflating the employer's burden in *Teamsters* with the one set out in *McDonnell Douglas*. *See* Maj. Op. at 23-25. While the majority asserts that the City need only provide "a nondiscriminatory explanation" under *Teamsters*, *id.* at 22, 25, 30, I think the City was required both under the law of this Circuit and the Supreme Court to show more. At the outset, the majority recognizes that "[i]n a pattern-or-practice case, the plaintiff's initial burden is heavier," *id.* at 21, however, it fails to recognize that a similarly heavy burden also exists for the defendant-employer under *Teamsters*.

11

**III. The Majority Failed to Notice *Teamsters'* "Insignificant or Inaccurate" Burden is Higher than that in *McDonnell Douglas*.**

First, the majority incorrectly tries to pare down the employer's higher bar in *Teamsters* to the one set out in *McDonnell Douglas*. Under *Teamsters*, the employer may only satisfy its heavy burden if its defense "meet[s] the prima facie case" and proves it is "insignificant or inaccurate." *Teamsters*, 431 F.3d at 360 n.46. The majority tries to evade *Teamsters'* more difficult "insignificant or inaccurate" burden by characterizing the language in *Reynolds* as dictum. Maj. Op. at 27 n.14. I find this characterization confounding. There is no reasonable reading of *Reynolds*, which can classify this language as dicta, especially because, as the majority admits, the Supreme Court in *Teamsters* clearly stated that the employer has the burden to "defeat" the prima facie case. *Id.* at 22-23. The employer's burden to *defeat* the prima facie case as insignificant or inaccurate can certainly not be said to be the same as *McDonnell Douglas'* requirement that the employer simply *rebut* the plaintiff's evidence with the offer of a nondiscriminatory reason. Still, the majority tries to lessen *Teamsters'* more stringent language by stating that although "'[d]efeat' might be thought to imply something stronger than [*McDonnell Douglas'* requirement to] 'rebut,'" the Court's language "means the same thing in both contexts." *Id.* at 23. This argument clearly disregards the plain language of not only *Teamsters*, but also the law of this Circuit that is binding on subsequent panels. Not only were the separate meanings of "defeat" and "rebut" intended by the Supreme Court's separate use of these two distinct words, but the separate meanings are underscored in the different standards requiring a demonstration that the plaintiff's proof is "inaccurate or insignificant" versus

12

showing some neutral legitimate reason.[8]

Additionally, the majority tries to convince us a lower bar can be met by quoting

*Teamsters*' recitation of the *McDonnell Douglas*' standard. Insofar as stating that *Teamsters*

may recognize the *McDonell Douglas* standard is relevant, the majority is in fact correct.

*Teamsters* does state that the employer may "provid[e] a nondiscriminatory explanation for the

apparently discriminatory result." *Id*. at 23. However, *Teamsters* does not state this will fully

satisfy the employer's duty to meet the "inaccurate or insignificant" standard. As explained by

the D.C. Circuit,

> [t]he bare articulation of a nondiscriminatory explanation, while sufficient to rebut an
> individual plaintiff's low-threshold *McDonnell Douglas* showing, generally will not
> suffice as a rebuttal to a typical class-wide showing of pervasive discrimination. . . . in
> both individual and class action contexts the defendant faces the same rebuttal burden; it
> must present sufficient evidence to permit the trier of fact to decline to draw the inference
> of discrimination from the plaintiffs' proof. But in the class action pattern or practice
> case the strength of the evidence sufficient to meet this rebuttal burden will typically
> need to be much higher than the strength of the evidence sufficient to rebut an individual
> plaintiff's low-threshold *McDonnell Douglas* showing.

*Segar*, 738 F.2d at 1269-70 (discussing applicability of *Teamsters* as opposed to *McDonnell*

*Douglas* to pattern-or-practice claims). In other words, the majority ignores the fact that in cases

with substantial statistical proof in the prima facie case, a *McDonnell Douglas* offering of a

nondiscriminatory reason will not satisfy the employer's burden under the higher *Teamsters* bar.

*See Hazelwood School Dist. v. United States*, 433 U.S. 299, 308-12 (1977) (detailing how

---

[8] Beyond disregarding the clear distinction in the separate instances of these words and
suggesting that the Supreme Court doesn't intend to use the word "defeat" when it uses it, the
majority seems to misconstrue the law even when the plain meaning of these words reveals
differences. The Oxford English Dictionary defines "defeat" as "To unmake, undo, do away
with; to ruin, destroy" in comparison to "rebut" as "to provide a counter-argument to." Oxford
English Dictionary (online ed. March 2012).

alternate statistics were necessary to rebut statistical prima facie showing). Instead, the

*McDonnell Douglas* standard is relevant only to the extent that *Teamsters* encompasses

*McDonnell Douglas*, but *Teamsters*' burden still requires more beyond it.

**IV. The Majority Failed to Recognize *Teamsters'* Method of Proof is More Difficult than**

***McDonnell Douglas'***

In addition to paring down the employer's burden under *Teamsters*, the majority also

inaccurately describes the method of proof required. The majority is correct that *Teamsters*

states the employer's proof need not be limited to statistics alone. However, as previously

explained, because pattern-or-practice suits usually focus on widespread discrimination, statistics

will often be necessary to make such a case.[9] Where a plaintiff presents such evidence as part of

its prima facie case, *Teamsters* requires the employer to counter with a different method of proof

than that which would be sufficient under *McDonnell Douglas*; it requires the employer to

address the cold hard numbers. Larson, § 9.03[2][a], at 9-18 to -19.

The majority disagrees. It admits the passage from Larson stating, the employer has

three avenues of attack to challenge "the plaintiff's statistics," quoted by this Court in *Robinson*,

"might be thought to require an employer to challenge the plaintiff's statistics," but the majority

abandons that interpretation. Maj. Op. at 26. Instead, the majority cites to the portion of

Larson's treatise, which states that a defendant may use "other non-statistical evidence tending

---

[9] "Statistics showing racial or ethnic imbalance are probative in [disparate treatment cases]," *Teamsters*, 431 U.S. at 340 n.20, and although anecdotal evidence may be useful to bring "the cold numbers convincingly to life," *id.* at 339, statistical evidence is often necessary and often sufficient to establish a prima face case, *id. See also Reynolds*, 685 F.3d at 203 (stating "statistics alone can make out a prima facie case of discrimination in a pattern-or-practice suit if the statistics reveal a gross disparity in the treatment of workers based on race") (internal citation, quotation marks and alterations omitted).

14

to rebut the inference of discrimination." *Id.* As stated above, this quotation does not present a contradiction; while use of non-statistical evidence is relevant, it is often not sufficient if it does not meet the prima facie evidence. Although Larson's treatise goes on to state, in a section called "Other Rebuttal Techniques," that one Seventh Circuit case found exclusive non-statistical evidence of "an employer's affirmative action efforts" may be relevant, Larson, § 9.03[2][c], at 9-20.1, this case is atypical. Larson's presentation of this case as an exception suggests that the defendant's rebuttal burden will often not be sufficient unless it defeats the plaintiff's statistical evidence or at the very minimum attacks those statistics. *See* Larson, § 9.03[2][a], [b].

As Larson states, defendant's burden is to "come forward with evidence sufficient to rebut the prima face case based on statistics." Larson, § 9.03[2], at 9-16. This means the employer's rebuttal will often be composed of targeting "flaws in the plaintiff's [statistical] evidence." Larson, § 9.03[2][a], at 9-17. In fact, Larson goes even further and states that the Supreme Court's decision in *Bazemore v. Friday*, 478 U.S. 385 (1986), has "been interpreted to imply that the defendant must do more than merely point out possible flaws in the plaintiff's statistical analysis, the defendant must also show that consideration of the missing factors would make a difference in the analytical outcome." Larson, § 9.03[2][b], at 9-19. Thus the defendant is often required to "present[] its own statistics to the court" which "a defendant will wish to argue . . . are more 'finely tuned' and have more probative force because they take into consideration a variety of relevant factors that the plaintiff's statistics ignore." Larson, § 9.03[2][b], at 9-19.

15

In addition to arguably misinterpreting Professor Larson's treatise, the majority disregards this Circuit's *actual* case law by claiming *Reynolds'* language on the method of proof, recognized in *Robinson*, is "dictum." Maj. Op. at 27 n.14. Moreover, the majority looks over the logical conclusion in *Robinson* and *Reynolds* that statistics are *not always* but often required because "[s]tatistics proffered during the 'liability phase' of a pattern-or-practice suit purport to demonstrate that a pattern of discrimination exists at *an entity*." *Reynolds*, 685 F.3d at 204 (emphasis in original). As the Court stated, "In a Title VII case, these statistics can make out a prima facie case that the employer was engaged in a pattern or practice of discrimination. This is because [statistics or] an analysis of the collective acts of those who do the employer's bidding bespeak the employer's motivation." *Id.*

This Court's prescriptions in *Robinson* and *Reynolds* acknowledge the most "basic" or common situation that the rebuttal will be statistical—not because they have misread *Teamsters* as stating the evidence must be exclusively statistical but because statistics will most often be necessary for the plaintiff to show the *entity* engaged in a pattern-or-practice. *Teamsters*, 431 U.S. at 339-40 n.20. Thus, as stated by Larson in his treatise, non-statistical proof may be relevant to disproving those statistics but it most often will not be sufficient. *See* Larson, § 9.03[2][a], [b], at 9-16 to -20. Regardless, whatever the plaintiff's proof is—statistical or otherwise—if the defendant does not show that proof to be inaccurate or insignificant it has not carried its burden of proof and summary judgment must be granted in favor of the plaintiffs.

In undermining our caselaw on the employer's method of proof, the majority also ignores the law of our sister Circuits that have held the same rule. It is well recognized among other Circuits that the employer must defeat the Government's statistical proof. *See Hohider*, 574 F.3d

16

at 183 ("The *Teamsters* framework was judicially promulgated as a method of proof for pattern-or-practice claims brought by the government under Title VII, as that statute authorizes—it provides a means by which courts can assess whether a particular form of statutorily prohibited discrimination exists, just as the *McDonnell Douglas* framework does for individual claims of disparate treatment."); *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 356 (5th Cir. 2001) (indicating the "*Teamsters* method of proof [is] an independent method of proof"); *Davoll v. Webb*, 194 F.3d 1116, 1148 (10th Cir. 1999) (noting the Supreme Court has "recognized that the specifics of the *McDonnell Douglas* framework are inapplicable in certain factual situations, including when the government has brought a broad-based pattern and practice action" and citing to *Teamsters*, 431 U.S. at 358-60); *Segar*, 738 F.2d at 1267-69 (discussing applicability of *Teamsters*' method of proof as opposed to *McDonnell Douglas* to pattern-or-practice claims).

The Intervenors' proof in this case, as in most pattern-or practice cases, was in fact *statistical*. Thus, the City's method of proof was required to be directed toward those statistics. The majority's classification of these differences in method proof as dictum and its choice not to apply *Teamsters*' and thus be satisfied by the City's facially neutral evidence, give no response to Intervenors' statistics that show a clear pattern and practice of discrimination. Whatever the proof, under *Teamsters*, the city was obligated to defeat it. Any other argument is contrary to the law of this Circuit and the Supreme Court.

**V. Applying *Teamsters*' the City Failed to Meet Its Burden**

In this case, there is no dispute that the Intervenors' claim alleges that the New York City Fire Department engaged in a pattern-or-practice for decades that led to black and other minority

17

firefighters being severely underrepresented in the Department. *See* Dist. Ct. Op. at 2; *see also* Maj. Op. at 6-8. As the district court stated, at the time this claim was filed, only 3.4% of the Department's force was composed of black firefighters despite black residents making up 25.6% of New York City's population. Dist. Ct. Op. at 2. In other words, in a city of over eight million people, and out of a force with 8,998 firefighters, the Department only employed 303 black firefighters. *Id.* Perhaps most egregious is that in an otherwise esteemed Department, this "one persistent stain" has remained an essentially unchanged practice since at least the 1960s.[10]

*Id.*

In accord with this pattern-or-practice case, the Intervenors presented copious statistical evidence. *Id*. at 6, 28. The district court found that the Intervenors met their burden,[11] *id.* at 28, but regardless, we need not reach that issue here, where, in fact, all parties agree the Intervenors

---

[10] In fact, as the district court found, the FDNY's rate of black firefighters has actually gone down:

> At the time of the [original] *Vulcan Society* litigation, blacks and Hispanics constituted 32% of the City's population, but only 5% of the Department. In 1990, almost two decades later, blacks made up 29% of the City's population, but only 4% of firefighters. In 2002, 25% of the City's residents were black, compared to only 2.6% of its firefighters. Between 1991 and 2007, black firefighters never constituted more than 3.9% of the force, and by the time this case was filed in 2007, the percentage of black firefighters in the FDNY had dropped to 3.4%.

Dist. Ct. Op. at 16 (internal citations omitted).

[11] As previously stated, the Intervenors met their burden by showing that black candidates disproportionately failed Written Exams 7029 and 2043 because of the pass/fail and rank ordering policies. Dist. Ct. Op. at 29-30. Additionally, the district court noted that this was not the first time the City had been brought to federal court for its discriminatory use of firefighter examinations. *Id*. at 11 (citing *Vulcan Soc'y of N.Y.C. Fire Dep't, Inc. v. Civil Serv. Comm'n*, 360 F. Supp. 1265, 1269 (S.D.N.Y. 1973), *affirmed in relevant part by* 490 F.2d 387 (2d Cir. 1973)). This showing was more than adequate to make out a prima facie case. Dist. Ct. Op. at 30 (citing *Waisome v. Port Auth. of N.Y. & N.J.*, 948 F.2d 1370, 1376 (2d Cir. 1991)).

met their prima facie case under *Teamsters*. Maj. Op. at 30. The only question that remains is whether the City defeated the statistical evidence proffered by the plaintiffs as insignificant or inaccurate. *See Teamsters*, 431 U.S. at 360.

To carry its burden, the City proffered what the majority characterized as "a nondiscriminatory reason" for using the test. Maj. Op. at 30-31. The City's response was that the test designers "did not intend to discriminate against any protected group," Dist. Ct. Dkt. 359 at 5, and that there is no evidence that the Mayor and the Fire Commissioner intended to discriminate, *id*. at 6-7. The City also stated that the FDNY made recruitment efforts to increase minority hiring. *Id*. at 9; *see also* Maj. Op. at 31.[12] In essence, the City stated that it had prepared the tests with "acceptable test development methods." *Id.*

Applying *Teamsters*' more difficult burden to the City's offering, the district court deemed it deficient because the City's evidence did not sufficiently attack the Intervenors' statistics. Maj. Op. at 33. Thus, the lower court found that even if the City offered evidence sufficient for a *McDonnell Douglas* method of proof, it didn't defeat the Intervenors' evidence

_____

[12] The City points us to more detailed evidence about its recruiting, Appellants' Br. at 13-14, as well as an attrition plan meant to "reduce minority candidate dropouts during the application process. It also points to evidence in the record that "that both exams were constructed in accordance with "standard job analytic and test development procedures." *Id.* at 19. The City also points us again to the increased EMT promotional exams. *Id.* at 20. Additionally, the City "also enlisted Columbia University's School of International and Public Affairs to analyze and recommend improvements to its diversity initiative ("the Columbia Study"). The Columbia Study arose in conjunction with the FDNY's "Strategic Plan" to rebuild and strengthen after 9/11, which identified enhancing diversity as one of its top six priorities." *Id.* Finally, the City points us to proof that it created an FDNY High School for Fire and Life, which is a "99% minority high school [that] incorporates firefighting and EMT studies with a traditional educational curriculum." *Id.* As Intervenors note, none of this evidence was called to the attention of the district court. Intervenors' Br.at 118-20. Even considering these facts, the City's argument still fails.

19

under *Teamsters*. The district court therefore granted summary judgment to the Intervenors on their pattern-or-practice case.

On appeal, the City tried to evade *Teamsters*' heavy burden by arguing that its offer of proof was sufficient according to *Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003). In *Raytheon*, the Supreme Court held that an employer's "proffer of [a] neutral . . . policy plainly satisfied its obligation under *McDonnell Douglas* to provide a legitimate, nondiscriminatory reason for the challenged action." *Id.* at 53. However, *Raytheon*, unlike the present case, involved an *individual*'s non-class claim. Hence the City, in this pattern-or-practice case, tried to evade the demanding burden by claiming *Teamsters* is but a mere gloss for *McDonnell Douglas*. Having established that *Teamsters* is distinct and applies a more difficult burden for employers, I conclude the City was required to defeat the Intervernors' proof as inaccurate or insignificant. Here it did not.

Moreover, where the City merely offered non-statistical proof, in the face of overwhelming statistics proving its discriminatory intent, the City failed to "meet" the prima facie case. Here the City rebutted with affidavits, non-statistical proof, that its employees created the Exams without a discriminatory motive. Although intent is crucial in Title VII cases, here where statistics are proof of the entity's discriminatory intent[12] the employer's burden is to defeat those statistics. The employer must show that the statistics, which show intent, are incorrect. The employer may not merely counter that it had no ill-motives.

---

[12] *See* Larson § 9.03[1], at 9-13 (stating that "[t]he ultimate burden in any disparate treatment case is to convince the fact finder that the defendant's actions were discriminatorily motivated" and that in a "pattern or practice suit" the plaintiff may depend on two forms of circumstantial evidence: 1) statistical proof "aimed at establishing the defendant's past treatment of the protected group" and 2) "testimony from protected class members").

Moreover, it may not disprove the entity's intent by merely stating the employees making the exam did not have a discriminatory motive. Instead, the statistics must be challenged. Even if non-statistical evidence is probative, the City did not present sufficient non-statistical evidence. Offering declarations that the designers of the Exams did not intend to *create* a discriminatory test in no sense goes to whether *use* of that test was discriminatory, as Intervernors proved. Even if the tests were not designed to discriminate against minorities, the use of them undisputedly did through the pass/fail and rank-ordering policies. Still, the majority tries to argue that the City's method of proof was sufficient because it challenged "the inference of intentional discrimination arising from the Intervenors' prima facie case." Maj. Op. at 33.

As already stated, although intent is key in Title VII cases when dealing with pattern-or-practice cases, mere proof of nondiscriminatory motivations in the creation of a test are not the end of the intent analysis. As this Court has previously stated, "[p]ersistent use of exams with disparate racial effects would support an inference of intentional discrimination if proper test construction were not even attempted." *Guardians Ass'n of the N.Y.C. Police Dep't, Inc. v. Civil Serv. Comm'n*, 630 F.2d 79 (2d Cir. 1980). Thus, if wishing to rely merely on non-statistical proof, the City was still obligated to raise some facts explaining why its knowing continued *use* of those tests was not evidence of discrimination. As the district court stated, the trouble is not the existence of the Exams per se but the City's policy or practice of subsequently using those Exams as pass/fail and rank-ordering devices. Dist. Ct. Op. at 38.

For this reason, I fully agree with the district court's conclusion that "the subjective motives of the people who *designed* the Exams are only circumstantially relevant to the question of whether the City's *decision to use* the Exams as screening and ranking devices was

21

discriminatory." *Id.* As hypothetically stated by the district court, a showing that the Exams were applied and reapplied with a nondiscriminatory intent would be "highly relevant to the City's defense because it would support an inference that the City's actual intent in enforcing [and reenforcing] the pass/fail and rank-ordering policies was to select the best candidates." *Id.* at 38-39. But the mere initial motivation of the test designers doesn't reach the issue of whether the City's ex post use of those tests was discriminatory.

Additionally, although intent may be relevant to the question of imposing injunctive relief under a disparate impact theory, *see Berkman v. City of New York*, 705 F.2d 584, 595 (2d Cir. 1983) (stating affirmative relief may be required where, for example, "the defendant has intentionally or egregiously engaged in a practice of discrimination"), that issue is not relevant at this initial stage under disparate treatment.[13] Where persistent use of the tests bear out evidence of discriminatory intent and without more proof addressing the Intervenors' statistics, the City cannot be said to have defeated the prima facie case.

Similarly, I find the fact that the City engaged in minority recruitment does not help to defeat the Intervenors' case because all the potential black and Hispanic firefighters that were recruited would still have been subjected to the challenged procedures. As the district court stated, once the Intervenors made out the prima facie case that the City's Exams discriminated against black applicants, proof of recruitment only proved "more blacks were taking the exam" and thus "more blacks were being illegally harmed, and the City's evidence is relevant only to

---

[13] Moreover, our Circuit has already determined in *Ass'n Against Discrimination in Emp't, Inc. v. City of Bridgeport*, 647 F.2d 256, 280 n.22 (2d Cir. 1981) that "the requirement that an employer have discriminated 'intentionally' in order for the provisions of 706(g) to come into play means not that there must have been a discriminatory purpose, but only that the acts must have been deliberate, not accidental."

the scope of the injury, not its source." Dist. Ct. Op. at 39. The majority cites to *Washington v. Davis*, 426 U.S. 229, 246 (1976), to argue affirmative efforts to recruit black officers negates the inference of intent, Maj. Op. at 34-35, but recruitment efforts simply do not satisfy the defendant's burden to "meet" the plaintiff's case under *Teamsters*.

Instead, what matters under *Teamsters* is "(1) whether the City has policies of screening and ranking applicants based on how well they perform the required task, (2) what effect those policies have on black applicants, and (3) why the City decided to adopt those policies." Dist. Ct. Op. at 38. Because the evidence of recruitment has no bearing on the challenged use of the Exams, because the City does not provide a sufficient nondiscriminatory explanation where statistics showed a discriminatory result, and because any recruits would ultimately face the discriminatory Exams, this evidence cannot serve to show that Intervernors' evidence was inaccurate or insignificant.

In this context, the City completely failed to meet Intervenors' proof, as required by *Teamsters*, and it did not even approach raising a material question of fact about whether the Intervenors' proof was inaccurate or insignificant on appeal. Thus, the City's apparent disinterest in fixing what it has known to be a problem for more than four decades and its apparent disinterest in defending itself now according to the *Teamsters* standard is precisely the type of disregard the *Teamsters* test was meant to protect against. For the foregoing reasons, I am unable to agree with the majority's conclusion that the City met its burden because the City may not meet its requirements by supplanting *Teamsters* with the *McDonnell Douglas* standard, and it is unreasonable to understand the language in *Robinson* and *Reynolds* as mere dicta. Accordingly, the Intervenors were entitled to summary judgment on their pattern-or-practice claim and I DISSENT from that part of the majority's opinion that holds otherwise.

23